# METROPOLITAN LIFE INSURANCE COMPANY, Appellant, v. GEORGE M. UNDERWOOD.

### In Banc, November 20, 1923.

1. **CANCELLATION OF INSURANCE POLICY: Character of Proof.** In a suit to cancel a life insurance policy on the ground that it was obtained by fraud, the burden is upon the plaintiff; and the

Metropolitan Life Ins. Co. v. Underwood.

evidence to sustain the fraud must be so clear, cogent and convincing as to leave no room for reasonable doubt in the conscience of the chancellor.

2. ————: ————: **Presumption of Honesty.** Fraud, conspiracy and falsehood will not be presumed without or against the evidence, but must be proven by convincing and cogent testimony by the party asserting it. While fraud may be proven by circumstances, yet if the transaction under consideration may as well consist with honesty and fair dealing as with a fraudulent purpose it will be referred to the better motive.

3. ————: **Fraud: Unusual Story: Consistent Throughout: Offered by Plaintiff.** Defendant's story that he was captured by highwaymen on a public street, taken in an automobile to a railroad some distance in the country, robbed of what money he had, tied face downward to the track rail with barbed fence wire, that after they left he broke a part of the wires and worked his body to one side of the rail, but could not break the wires that held his left foot and left hand, and that a passenger train which came a few minutes later ran over his hand and foot, is an unusual story, but being consistent throughout and contradicted by no other witness and no other circumstance, and being in the form of a deposition, taken and introduced in evidence by plaintiff, as an admission, is not sufficient to sustain the charge that defendant voluntarily placed himself upon the track and tied himself to the rail in such a way as to cause the loss of one entire hand and one entire foot in order to reap at once the full benefit of an accident insurance policy issued to him only a few days previously, and is not sufficient to meet the demands of the law which places the burden upon plaintiff to prove the fraud by cogent and convincing proof; but, being the only testimony on the point and being consistent throughout and having been offered by plaintiff as an admission, disproves such charge, and authorizes a judgment on his crossbill.

4. ————: ————: **Indebtedness: Policy Sought by Company.** The defendant, a hard-working middle-aged man, engaged in operating two or three public taxicabs, a straw-and-hay bailer and a restaurant and rooming-house in a good town, was heavily in debt, his property being mortgaged for about as much as it was worth; he did business with three banks, and at one of them, at least, his account was overdrawn, but his checks were uniformly honored, and he was not hard-pressed by his creditors or threatened with foreclosure or suit; in February he took out a life policy in an old line company, in May one in an accident company, on June 2d another in an accident company, and on July 11th was solicited

by plaintiff's agent to take out the policy for $10,000 which plaintiff by this suit seeks to have cancelled; it provided for a monthly payment of one hundred dollars in case of total disability, and that the loss of "one entire hand and one entire foot" should be considered a total disability; one of the policies was conditioned upon the loss of a hand or foot "while being robbed," and the entire amount recoverable under all the policies would produce enough money to pay all his debts, and a substantial sum besides, a life income of $120 per month, and paid-up insurance of $22,000 for his wife at his death under certain contingencies; he did not keep a close account of his obligations, was not prudent in incurring them, but was hopeful and optimistic. He had gone to a town fifty or sixty miles from his home to transact some business, and testified that about dusk as he walked along the street he was captured by highwaymen, who with their guns forced him into an automobile, drove into the country to a railroad, robbed him of seventy dollars and tied him to the track rail with fence wire, and a passenger train running backwards coming along soon afterwards so crushed one hand and one foot that both had to be amputated. *Held*, that the hard-and-fast rules governing conservative and careful business men cannot be applied to him; that the amount of insurance is not persuasive evidence of a fraudulent purpose; that the fact that he did not seek the insurance is a potent fact showing he did not fraudulently procure it; and that the fact that he lost one hand and one foot, while being robbed, does not render his unusual but consistent and uncontradicted story unbelievable.

5. ———: ———: **Danger of Death.** It is not reasonable that defendant, in order to obtain the benefit of accident policies by the loss of one hand and one foot, would seek almost certain death by tying himself to a railroad track with fence wire.

6. ———: ———: **Robbery: Murder of Victim.** Robbery and murder, with or without cause, in almost all conceivable ways, have been of almost daily occurrence in late years, especially in and near large cities, facilitated as they are by the ease with which criminals can capture and carry off their victims and escape in automobiles; and defendant's story that he was captured by two men in an automobile, as he walked alone along a public street in the dusk of a June evening, forced with guns drawn on him to enter their automobile, was taken to a railroad in the country, robbed of what money he had, then placed lengthwise of the track rail head downwards, and tied with wire taken from a near-by fence, and that by squirming and pulling he managed to get his body off the rail, but could not untie his left hand and left foot, and that they were run over by a backing engine a few minutes

later, is not, in view of such general conditions of robbery and murder, an impossible story. Besides, the loss of one hand and one foot is not considered improbable by insurance companies, since one of the policies held by defendant made such loss the only contingency upon which he could receive any benefit therefrom in case of injury by others.

7.  ———: Self-Inflicted Injury: Facts Consistent with Defendant's Testimony. Many circumstances which it is contended demonstrate that defendant voluntarily tied himself to a railroad track in such a way as to cause the loss of his hand and foot when a train ran over it, in order that he might immediately receive the benefit of accident insurance policies—the fact that his foot was mashed from the back part of his heel diagonally across his instep in the same manner and place his shoe was mashed; the fact that the shoe was cut in two and no blood was found in or on it, and that when he was found soon afterwards his foot was bleeding very little, only an·occasional drop; the fact that he testified he made an outcry immediately after robbers had tied him to the track and had left, which was not heard, but a cry made soon after the wheels had passed over his hand and foot was heard; the fact that there was a depression at the end of the cars, made by tramping, which enabled him to shield his body from the engine and tender which passed over his foot and hand; the fact that some of the barbed wire 'with which he was tied to the rail was old and easily broken, while other parts were firm and strong; the fact that his body was not scratched by the barbs of the wire, although his heavy clothes were torn and punctured in several places; and the fact that automobile tracks indicated that an automobile had stopped where he said the robbers' car did and backed out and went in the direction he testified, and that no other automobile reached that immediate place until these tracks were examined— are fully reviewed, and it is *held* that none of them contradict defendant's testimony that he was captured by highwaymen, taken in their automobile to the railroad, robbed of what money he had, tied to the track rail with barbed wire taken from a nearby fence, and left to be run over by a train, and that by squirming and struggling he removed his body from the rail, but could not remove his left hand or left foot, and that the engine, running backwards, mashed his hand and cut his foot in two.

8.  ———: Res Gestae: Statement Immediately After Injury. The statement made by defendant to a witness who reached him within a few minutes after his hand and foot were run over by a railroad engine, that he had been robbed and tied to the track by robbers, was a part of the *res gestae*, and was competent evidence of the truth of the fact so stated to the witness.

9. ———: Failure to Testify: Presumption. Where the defendant's deposition was taken by plaintiff, and he was fully interrogated and fully testified as to all the material facts and circumstances arising on the case, and such deposition is read by plaintiff as an admission, no presumption is to be indulged against him because of his failure to testify at the trial. Having testified once, he is not required to testify twice, and under such circumstances the rule, that there is a presumption against a party charged with fraud who fails to testify and defend himself against the charge, does not apply.

Appeal from Carroll Circuit Court.—*Hon. Ralph Hughes,* Judge.

AFFIRMED.

*Haff, Meservey, German & Michaels, Lozier & Morris* and *Blackmar & Bundschu* for appellant; *William J. Tully* of counsel.

(1)   Plaintiff is well lodged in equity; it showed itself to be entitled to the relief prayed. And hereunder: (a)   Fraud is the most ancient ground of equity jurisdiction. Equity will always grant relief against fraud, wherever and in whatever guise it appears. Jones v. Bolles, 9 Wall. 364; Hanson v. Neal, 215 Mo. 256; Peters v. Lohman, 171 Mo. App. 483; Stewart v. Caldwell, 54 Mo. 536; Howard v. Zweigart, 197 S. W. 46. (b). The relief sought, cancellation of an instrument which it would be inequitable for defendant to hold, is of pure equitable cognizance. Crater v. Ins. Co., 275 Mo. 284; Peters v. Lohman, 171 Mo. App. 483; Ritterhoff v. Bank, 37 Wash. 76; Schuerman v. Ins. Co., 165 Mo. 652; Reid v. Shaffer, 249 Fed. 553; Parks v. Bank, 97 Mo. 132. (c)   The life and accident features of the policy are inseparable. The contract is a continuing one. By his frauds Underwood attempted to partially mature the policy. He fraudulently concealed his plans from plaintiff. He fraudulently rendered himself a hazardous risk and shortened his life expectancy. Regardless of any misrepresen-

tation in the written application, a court of equity will not tolerate such frauds and will not permit such a continuing contract to remain in the hands of the defendant, and it will order the policy to be delivered up and canceled and enjoin the defendant from harassing plaintiff by suits in this State or elsewhere. Sylvester Coal Co. v. St. Louis, 130 Mo. 329; Barrington v. Ryan, 88 Mo. App. 95; Aimee Realty Co. v. Haller, 128 Mo. App. 72; Jones v. Bolles, 9 Wall. 364, 19 L. Ed. 736; Martin v. Graves, 5 Allen, 601; Schuerman v. Ins. Co., 165 Mo. 641; Hanson v. Neal, 215 Mo. 279; Owings v. McKenzie, 133 Mo. 324; Carter v. Ins. Co., 275 Mo. 84; Reid v. Shaffer, 249 Fed. 553; 1 Story's Equity (11 Ed.) sec. 33; Black on Rescission and Cancellation, sec. 58; Bacon on Life Ins. (4 Ed.) sec. 372; Hartford v. Chipman, 21 Conn. 488; Conn. Ins. Co. v. Home Ins. Co. 17 Blatch. 145; Ferguson v. Fisk, 28 Conn. 501; Hamilton v. Cummings, 1 John. Ch. 517; Johnson v. Wetmore, 12 Barb. 435; Bank v. White, 6 Barb. 605; Fuller v. Percival, 126 Mass. 382; McHenry v. Hazard, 45 N. Y. 584; Hardy v. Brier, 91 Ind. 93; Ins. Co. v. Glaser, 245 Mo. 390; Notes in 5 L. R. A. (N. S.) 1084; Barr v. Baker, 9 Mo. 850. (d) Underwood is the beneficiary as well as the insured in the policy; and beneficiary is never permitted to succeed in litigation when he, himself, either causes or participates in any fraud connected with the procurement of the policy or in any attempt to bring about any event insured against. Carter v. Ins. Co., 275 Mo. 85; 25 Cyc. 895; 29 Cyc. 1293; Ins. Co. v. Armstrong, 117 U. S. 59; Met. Life Ins. Co. v. Shane, 135 S. W. 836; Schmidt v. Northern Life Assn., 51 L. R. A. 141. (2) In equity cases, this court will review the evidence and make up its own findings of fact and law, uninfluenced by the chancellor's findings. This is peculiarly true in this case, since the greater part of the important testimony was by deposition or in documents, and there was no conflict in the oral evidence on any material matter. Watt v. Loving, 240 S. W. 122; Pitts v. Pitts, 201 Mo. 356; Huggins v.

Hill, 236 S. W. 1052;   Fanning v. Doan, 139 Mo. 415; Lovitt v. Russell, 138 Mo. 481;   Kinney v. Murray, 170 Mo. 707;   Stotesbury v. Kirtland, 35 Mo. App. 159.   (3) This court has taken notice that persons do maim themselves, and in the light of such judicial notice and in view of the facts developed in the case, the bare presumption, if any, that no person will voluntarily maim himself, entirely disappears.   Lamport v. Aetna, 199 S. W. 1024; State ex rel. v. Ellison, 268 Mo. 248;   Mockowik v. Railroad, 196 Mo. 571;   Long v. Travelers Ins. Co., 85 N. W. 24.   (4) Fraudulent procurement and fraudulent plan were clearly proved.   Several badges of fraud appear. (a)   Underwood was insolvent, and this is a "badge of fraud."   Elliott v. Life Ins. Co., 163 Mo. 132;   Everson v. Casualty Co., 208 Mass. 214;   Long v. Ins. Co., 85 N. W. 24;   Smith v. Benefit Soc., 25 N. E. 197.   (b) Underwood had only recently taken out other similar insurance, and this, too, is a "badge of fraud."   Whitmore v. Sup. Lodge, 100 Mo. 48;   Mutual Life v. Armstrong, 117 U. S. 591; Elliott v. Life Ins. Co., 163 Mo. 149;   Smith v. Benefit Soc., 25 N. E. 197.   (c) Underwood did not take the stand to testify and this failure carries with it the damaging presumption that plaintiff's charges of fraud are true.   And although his deposition was read by plaintiff, it did not cover or touch many important things developed at the trial which it was his duty to refute or explain, if possible; and his silence must be taken as an admission of the fraud charged.   Schooler v. Schooler, 258 Mo. 95; Lamport v. Aetna, 199 S. W. 1025;   Ins. Co. v. Smith, 117 Mo. 294; Baldwin v. Whitcomb, 71 Mo. 658;   Union Bank v. Stone, 50 Me. 595;   The Sloop Julia, 1 Gall. 233; Keller v. Gill, 92 Md. 190;   Black v. Eppstein, 221 Mo. 302;   Hutchinson v. Sunshine, 218 S. W. 951; Fisher v. Travelers Ins. Co., 120 Tenn. 450;   Thomas v. Equitable L. Co., 198 Mo. App. 533;   Clifford Banking Co. v. Donovan Com. Co., 195 Mo. 285;   Leeper v. Bates, 85 Mo. 228;   State v. Musick, 101 Mo. 271;   Payne v. Railroad, 136 Mo. 594; Howard v. Zweigart, 197 S. W. 46;   Moore on Facts,

secs. 571, 574; Societe v. Allen, 90 Fed. 815; Dickinson v. Bentley, 80 Iowa, 482; Starkie on Evidence, p. 54; McClanahan v. Railway, 147 Mo. App. 412; State v. Patrick, 107 Mo. 174; State v. Alexander, 119 Mo. 461; Cass Co. v. Green, 66 Mo. 512; Mockowik v. Railroad, 196 Mo. 571; Stephenson v. Kilpatrick, 166 Mo. 262; Mawbray v. McClurg, 74 Mo. 591; Steele v. Ry. Co., 265 Mo. 97. (d) Underwood's left shoe, without blood in it or on it, found wired to the rail, is in connection with the testimony of the finders of the shoe, in itself a sufficient badge to conclusively prove the charge of plaintiff that Underwood himself caused his injuries. Champagne v. Hamey, 189 Mo. 726. (e) Underwood's story as to how the injuries were received is improbable on its face and warrants an inference of bad faith and fraud. Courts will not surrender their intelligence to witnesses testifying to an impossibility. Sexton v. Met. St. Ry. Co., 245 Mo. 273. (f) In view of the testimony respecting the admitted mechanical extensions on the engine, the impossibility of Underwood's story is apparent and this one thing, alone, stamps his whole account of the happenings as false, and establishes our charges of fraud. Testimony opposed to physical facts is no testimony at all. Sexton v. Met. St. Ry. Co., 245 Mo. 273; Champagne v. Hamey, 189 Mo. 726. (5) The whole evidence showed beyond doubt, and most conclusively, that the injuries were self-inflicted; were the result of a fraudulent plan, and that plaintiff is entitled to the relief it prayed. (6) The cross-bill should be dismissed. Lamport v. Aetna, 199 S. W. 1024; Griffith v. Cont. Casualty Co., 235 S. W. 83.

*Atwood & Atwood, Ben S. Heins, Conkling & Withers* and *Busby, Sparrow & Patterson* for respondent.

(1) Plaintiff is not entitled to the relief prayed, and the provisions of Sec. 6142, R. S. 1919, apply. Christian v. Conn. Mut. Life Ins. Co., 143 Mo. 465; State ex rel. v. Reynolds, 287 Mo. 169; Wilson v. Brotherhood, 237 S.

W. 212;  Makos v. Bankers Accident Ins. Co., 234 S. W. 370.  (2)  This court will look upon the chancellor's findings of fact as very persuasive where a substantial part of the evidence was oral testimony delivered in his presence, and in this case more than one-third of the entire testimony, nearly one-half in number of the witnesses and evidence of the most vital importance, was heard in open court.  Collins v. Harrell, 219 Mo. 308;  Cornet v. Bertelsmann, 61 Mo. 126;  Reid v. Brotherhood, 232 S. W. 187. (3)  The presumption that no person will voluntarily maim himself never entirely disappears, and if the court takes judicial notice that persons do maim themselves, it also takes like notice of the fact that persons are maimed by others in the manner detailed by this defendant. Lamport v. Aetna Life Ins. Co., 199 S. W. 1020; Vormehr v. Knights of Maccabees, 198 Mo. 281; Laessig v. Travelers Protective Assn., 169 Mo. 281;  State ex rel. v. Ellison, 268 Mo. 255;  Rodan v. St. Louis Tr. Co., 207 Mo. 408;  Manchester Bank v. Herrington, 199 S. W. 249. (4)  There was no fraud in the procurement of the policy. (a)  Underwood was not insolvent when he took out the policy, but even if he had been, the courts have never designated insolvency as a "badge of fraud."  Plaintiff's charge is not supported by the cases cited or any others that we can find.  (b)  Underwood's other insurance was taken out at reasonable intervals and under proper circumstances, but the courts have never held that taking out other similar insurance is a "badge of fraud."  The cases cited by plaintiff are not in point.  (c)  Underwood never refused to testify.  Plaintiff took Underwood's deposition, which comprises fully one-fourth of the thirteen hundred-page printed abstract of the record in this case.  Surely no adverse presumption will be lodged against defendant because he did not again take the stand and further swell the record, already filled with plaintiff's vain repetitions. Clapp v. Kenley, 277 Mo. 391; Moore on Facts, sec. 571;  Black v. Epstein, 221 Mo. 302; Chandler v. Fleeman, 50 Mo. 240;  Lamport v. General

Acc. Co., 272 Mo. 19; 22 C. J. 121, footnote 23 (d); Lamport v. Aetna Life Ins. Co., 199 S. W. 1025. (d) Underwood's left shoe, without blood on it, found wired to the rail, is strongly corroborative of Underwood's account of the manner in which his injuries were received. The cases cited by plaintiff do not hold otherwise. (e) Underwood's account of how his injuries were received is plausible and bears the stamp of sincerity and truth. Plaintiff's proffered theory is most improbable. (f) The engine and track measurements in evidence do not make Underwood's account impossible, but on the contrary, they strengthen and corroborate his testimony in every particular. (5) The whole evidence showed beyond doubt and most conclusively that Underwood's injuries were not self-inflicted. Cases cited under points 4 and 7. (6) Defendant is entitled to the relief prayed for in his cross-bill. (7) Plaintiff had the burden of proof and failed to sustain it. Chandler v. Fleeman, 50 Mo. 240; Troll v. Spencer, 238 Mo. 101; Lamport v. Aetna Life Ins. Co., 199 S. W. 1024; Reynolds v. Maryland Cas. Co., 274 Mo. 83; Hester v. Fidelity & Casualty Co., 69 Mo. App. 194; 2 Bacon on Life & Acc. Ins. (4 Ed.) 1240.

SMALL, C.—The suit is in equity to cancel a combined life and accident policy, issued on June 11, 1920, on the life of the defendant, George M. Underwood, for $10,000, in favor his wife, Nellie M. Underwood, with a surrender value payable to defendant, if living after the payment of twenty successive yearly premiums, with the further provision that, if defendant should become permanently disabled, plaintiff insurance company would pay defendant during the continuance of such disability a monthly annuity of a hundred dollars, and that the severance of both hands, or both feet, "or of one entire hand, and one entire foot, would be considered as total disability, within the meaning of the terms of said policy." It was further provided that should defendant die, as the

result of bodily injury, from external, violent and accidental means, within sixty days after such injury, the company would pay the beneficiary the further sum of $10,000.

Numerous grounds of fraud are alleged in the petition for setting aside said policy, but all are abandoned here except the following: That defendant was in straightened financial circumstances, and he applied for and procured such insurance with the intention to deliberately undertake to bring about total disability, within the meaning of said policy, and that within sixty hours after plaintiff's policy was delivered to defendant, in futherance of his purpose to defraud, he caused an injury to himself, by wilfully protruding his left arm and left leg under the wheels of a moving train on the Wabash Railway near Excelsior Springs, Missouri, for the purpose of having the same severed, and that as a result thereof defendant's left foot was so injured that it had to be amputated, and his left hand was also injured, "but not so badly that complete amputation above the wrist was necessary, but that defendant wilfully neglected medical attention to his hand, so that it had to be amputated. . . . That said injuries have rendered defendant more susceptible and liable to the risk of loss of his life by accident in the future . . . and have lowered defendant's exceptancy or chance to live out his expectancy."

The answer admitted the execution and delivery of the policy sought to be cancelled, and put all the other allegations of the petition in issue, and also set up a counterclaim, alleging the issue of said policy, its terms and conditions, payment of the premium, and that defendant was injured on June 16, 1920, by his left foot and left hand being run over and injured by a moving train, so as to require the amputation thereof, constituting total and permanent disability, within the meaning of said policy, whereby plaintiff became liable to defendant from six months after June 30, 1920, for a monthly annuity of $100 per month, during the remainder of defendant's

life, in addition to all other benefits provided by said policy, together with damages and attorneys' fees for vexatious delay, for all of which defendant prayed judgment.

The reply put the new matter of the answer and the cross-bill in issue.

The court rendered judgment against the plaintiff on its petition, and in favor of the defendant on his cross-bill (but not for attorneys' fees or damages for vexatious delay), from which plaintiff appealed to this court.

The whole question, in this court, is, whether or not the defendant voluntarily caused his hand and foot to be run over by a train on the Wabash Railway, just after dark, about nine o'clock P. M., on June 16, 1920, in the suburbs of Excelsior Springs, as claimed by the plaintiff, or whether defendant was, at that time and place, after being robbed of some seventy dollars, tied upon said railroad track by the robbers, and that by reason thereof his left hand and left foot were run over and had to be amputated. The evidence is very voluminous and takes a wide range. The record consists of some 1300 printed pages. The story, as told by Underwood in his deposition, which occupies one-fourth of the record, which plaintiff took in February, 1921, and read in evidence, as an admission, at the trial, was substantially, as follows:

He was born and raised in Carroll County, Missouri, on a farm, near Wakenda and Carrollton. He had a number of brothers and sisters. He was the youngest of the boys. He remained on the farm until he was fifteen years of age, when his father died. After that, he engaged in various occupations, at first, working as a section hand and foreman on the Wabash and other railroads. He then married, and worked on his father-in-law's farm in the neighborhood for some years, and then moved to the Underwood family homestead, and lived there with his mother and his wife and two children, engaged in farming, and also in running a straw and hay bailer, and perhaps the jitney business, just before moving to Carroll-

ton.   The home farm was sold in the spring of 1920, from which defendant received as his share $660.   About March 1, 1920, he moved to Carrollton, where he purchased a restaurant and started in the restaurant business.   He also owned two or three automobiles and engaged in the jitney business, and contemplated continuing his straw-bailing business.   Before he moved to Carrollton, he had $500 accident insurance in the Woodmen.   Soon afterwards, he was solicited by various insurance agents to take out further accident and life insurance.   He took out a policy in the New York Life Insurance Company dated February 6, 1920; and in the Fidelity & Casualty Company of New York, dated May 24, 1920.   On June 2, 1920, he took out a policy for $4400 in the Lyon Bonding & Surety Company.   This policy contains the following provisions: "This policy does not cover any injury fatal or disabling, sustained by the insured, prior to the date of his acceptance of this policy, as the result of any act of the insured, sane or insane, done for the purpose of injuring himself; or the act of any other persons, sane or insane, done to injure the insured, except for the sole purpose of burglary or robbery."   The last policy he took out was the policy sought to be cancelled in this case.   The total amount of annual premiums on all the policies was $645.86.   Under all the policies, in case he lost a hand and foot, he would receive $9900 in cash, plus an annuity of $1400 per annum during his life, and $22,000 paid-up insurance payable to his wife at his death, under certain conditions, with a substantial cash surrender value.

Before defendant purchased the restaurant at Carrollton, he had for a number of years been doing business with and was indebted to the Carroll Exchange Bank, the First National Bank of Carrollton, and the Wakenda Bank of Wakenda.   His father-in-law was security on his notes of $1,250 to the Carrollton Exchange Bank, and his brother-in-law upon his notes for about the same amount to the First National Bank, which the officers of the banks testified, made his notes good. On June 3rd, the date of the

policy in question, he received notice that the $1,250 due the Carroll Exchange Bank on June 11th would have to be paid. He had on June 2nd given a check on that bank for $350 to the Wakenda Bank, which on June 8th was dishonored and protested for want of funds. On June 11th the $1,250 note to the Exchange Bank was not paid, and it remained unpaid at the time of the trial. He owed the Wakenda Bank a note of $2,500, which was secured by a chattel mortgage on his restaurant, automobiles and other personal property. He had no real estate after the sale of the homestead in the spring of 1920. The Wakenda Bank also loaned him some $2200 more, for which they took the notes of his wife and one Mueller, who worked as jitney driver for him, neither of whom had any property. The capital stock of the Wakenda Bank was but $10,000, and the notes of his wife and Mueller were taken for the $2200 loan, because Underwood had already borrowed one-fourth of the capital stock of the bank and could borrow no more under the law. After the injury to Underwood on June 16th, the Wakenda Bank was forced to reorganize and the principal stockholders took up the notes made by his wife and Mueller. The evidence shows that his total indebtedness was about $8000 before his injury, and that all his property, which was not worth exceeding that sum, was mortgaged; but that he was doing a fair business in his different undertakings, and that his credit was good at the Wakenda Bank. He also had an offer of assistance to pay what he owed the Exchange Bank from one Kenyon, but owing to an injury to Kenyon, the loan was not consummated prior to the injury to Underwood. On the 14th of June, 1920, when the policy in suit was delivered, he gave a check on the Wakenda Bank to Clark, the agent of the plaintiff at Carrollton, for $474.50, the amount of the first premium. He requested Clark to hold the check until the next day, which he did. On the 15th Clark deposited the check for credit in the Carroll Exchange Bank. The officers of the Exchange Bank telephoned to the Wakenda Bank, and asked whether the check

would be paid, and that bank said it would, which was afterwards done. The officials of the Bank of Wakenda testified that they would have honored any check he would have drawn on their bank for a reasonable sum, including a check for $1200 to McDavid for a car hereafter mentioned, had Underwood purchased the same, although it would overdraw his account, because they had confidence that he would take care of it to their satisfaction.

On the night of June 14, 1920, Underwood stayed at his restaurant all night. He had furnished rooms above his restaurant, which he rented out as a part of his business. He occupied one of these rooms. The next morning he went to Kansas City for the purpose of hiring a cook for his restaurant, and also to inquire about an electric coffee urn, which he had ordered from the Towne Manufacturing Company, and to see about buying some tableware. A Mr. Noland went with him from Carrollton to Kansas City. Noland went to see his mother, who lived there. During the day Underwood attended to the business he went to Kansas City to transact. That night Noland and he stayed together at the Palace Hotel on Main Street. The next morning Underwood attended to some further matters, and in the afternoon took the interurban cars for Liberty, arriving there at about two o'clock in the afternoon of June 16th. A week or so before he had left an Allen car at Bell's garage at Liberty to be repaired. He intended to take that car and drive home to Carrollton that night, but he found that it was not ready. He concluded to go on to Excelsior Springs to see a Mr. McDavid, who owned a garage there, and with whom he had negotiated a few weeks before for the purchase of a car. He thought he could purchase the car for about $1200, and drive home with it that night. He expected to pay for it by giving McDavid a check on the Wakenda Bank for the money, where he was already overdrawn, or had but little funds, and arrange for the payment of the check by the bank after he reached home. He and McDavid were old acquaintances. He arrived at

Excelsior Springs about five o'clock, went to McDavid's garage, but McDavid was not there. He then left and walked around Excelsior Springs, and afterwards went back to McDavid's garage and found he had not returned. He then went away again, and after eating a sandwich or two at a restaurant, he walked down towards the Elms Hotel to a park in that vicinity. There he assisted a man in fixing a spark plug on a Ford car, and when it was fixed he rode about a block south on the footboard, when he alighted and proceeded to continue his walk. He intended to take another road a short distance from there, which led back to McDavid's garage. As he was walking along on the sidewalk, a closed car drove up and came to a stop in front of or near him, and the occupants asked him the road to Kansas City, and one of them got out and raised the hood of the car. Underwood stopped and went up to where the party was and asked what was the matter. Thereupon, he was ordered by the man at the point of a gun to hold up his hands and to get into the car in the front seat. He did so. The man then locked the hood and got in the back seat. He had a gun in his hand and held it on Underwood. The man at the wheel also had a gun. The car then started up and proceeded south. Underwood says he attempted to protest, but the men told him to shut up or they would shoot his head off, and for him to keep his hands up, which he did. They went perhaps a quarter of a mile and stopped near a large tree. They said something in Italian, or some foreign language, to each other, which Underwood did not understand, and then drove on a short distance further south. The public road on which they drove ran along the west side of the Wabash Railway track and right-of-way. When they had proceeded a short distance, they stopped again on the side of the road. Both of the men got out, ordered Underwood out, and compelled him to go with them through the wire fence, which separated the public road from the railroad, and to accompany them to the railroad track. They then asked him if he had any money. He

said he did not have much. All of this time, they held their guns on him. One of them put his hand in Underwood's trouser side-pocket and took out his purse, in which he had only a few dollars and a pocket knife and a bunch of keys. They also took his watch, which was a cheap affair. They asked him if this was all he had, and he said it was. They then continued their search and found a folder in his hip pocket in which Underwood had some seventy dollars in bills, which he says he took with him from Carrollton to pay expenses on the trip, as well as the bill for repairing the Allen car at Liberty. They took this money and then muttered something to him, which he took to be a threat, because he had not told them the truth about his money. One of the robbers then went in a southerly direction and soon returned with some old barbed fence wire. In the meantime, the one that remained, had kept Underwood covered with a gun. They then proceeded to tie Underwood's hands together in front of him by wrapping the wire around both arms about half way between his wrist and his elbow. They said they were going to "make him beat it up the track." After they had his hands tied in this manner, one of them jerked Underwood's shirt out of his trousers, tore off a strip and tied it around Underwood's mouth, so that he could not make an outcry. At the same time they again told him they were going to make him "beat it up the track." He thought they were going to do so, and he would be turned loose. But after they tied his hands and gagged him, they told him they were going to tie him to the railroad track and let the train run over him. They forced him to lie down on the east rail, and tied him to it with the barbed ware. They tied him face down with his head to the north, or towards Excelsior Springs, with one leg and one foot on each side of the rail. They did not wrap any wire about his head or neck, but did wrap it around his shoulders and arms, body, legs and feet, running the wire under the rail each time. When they first reached the track it was dusk but not entirely dark. But

at the time they tied him on the track, it had become quite dark, so that a man was not distinctly visible, except at a short distance.  When they finished tying him, they departed, and he heard their footsteps going south in the direction from which they had come.  He soon heard them cranking their car, and heard it start and pass him going north, back towards Excelsior Springs.  He then commenced to use all his endeavors to get loose.  He soon succeeded in breaking the wire in one place by working it back and forth with his hands, so as to get his right arm loose, when he removed the gag from his mouth and cried out for help.  He succeeded in working his body off of the rail and on the east side of it, but with his left foot and left arm still tied to the rail.  He continued to work, as best he could, to get himself loose and to cry out for help, but no help came, and before he could get free he heard the train coming from the south, back of him.  He immediately put his head down, lay as flat as possible and pushed himself as far away from the rail as he could, but was unable to get his left hand and left foot away from the track.  He thought that his time had come, and he thought of his folks at home.  The train came on, and he lost consciousness.  When he came to, he was lying on the edge of the ballast and again cried for help.  There was a house near the east side of the track, about 640 feet north of where he lay.  Mr. and Mrs. Snedden lived in this house.  The doors and windows were open.  It was about half-past nine o'clock.  Mr. Snedden had already retired, but Mrs. Snedden had not.  She heard Underwood's cry of "Help! Help!"  Her husband, who was somewhat deaf, did not.  She told her husband, and he jumped up, put on his overalls and went out in his bare feet.  He then heard the cry and said: "I am coming," and Underwood shouted, "For God's sake! Hurry up!"  Snedden then went south in the direction from whence Underwood cried out.  It was so dark, however, that he did not see Underwood.  He thought it was a man whom he knew by the name of Fox, and he said, "Is that you,

John Fox?'' Underwood replied, ''No,'' that his name was Underwood. When he got up close to him, Underwood told him that he had been robbed and tied to the railroad track by the robbers, and that the train had run over his hand and foot, and for him to get a doctor.

Mrs. Snedden, who had accompanied her husband to the right of way, returned to the house to call a doctor. She had her thirteen-year-old son call Doctors Lowry and O'Dell. Meanwhile, Snedden assisted Underwood to arise and hop a short distance on his right foot towards the Snedden house, but no progress could be made in this way and he attempted to crawl, but this was also a failure. Snedden called for his wife to come and assist him, and between them they got Underwood to their house and laid him down on the bed. The doctors soon arrived in a machine. They gave him a hypodermic and took him to the Challen Sanatarium at Excelsior Springs, where they afterwards, that night, amputated his left foot. The next day or so after he was taken to the Challen Sanatarium, Underwood sent for his family physician, Dr. Benson, who, with the two other doctors in attendance, treated him at this sanatarium for about a week, endeavoring to save his hand. He was then removed to his home in Carrollton, where in a day or so Dr. Benson amputated two of his fingers, and removed him to the hospital in Carrollton, where shortly afterwards, he amputated the remainder of the hand just above the wrist. It was impossible to save any part of it. While at the sanatarium, Underwood was visited by McDavid and others, and afterwards, while at his home, by many, including the agents for the insurance companies, who questioned him as to the cause of his injury. They testified for plaintiff as to his conversations with them in regard thereto. He told them (taking all of their testimony together) substantially the same story, as given in his disposition, which we have above narrated. So Underwood's statement, in his deposition, as to his journey on the morning of June 14th from Carrollton to Kansas City, and from there to Liber-

ty and Excelsior Springs on the 16th of June, as well as his transactions and visits to various places in Kansas City, Liberty and Excelsior Springs on the trip before his injury, were corroborated by apparently disinterested parties and not contradicted in any substantial respect by any of the testimony. No one testified, however, to seeing him, after his last visit to the McDavid garage, or to seeing anything of the robbers.

I. In a suit in equity, seeking to cancel a policy of insurance, as having been obtained by fraud, the burden is upon the plaintiff and "the evidence of such fraud must be so clear, cogent and convincing as to leave no room for reasonable doubt in the conscience of the court." [Guaranty Life Ins. Co. v. Frumson, 236 S. W. l. c. 316.] "The law is, that fraud, conspiracy and falsehood will not be presumed without or against the evidence, but must be proven by convincing and cogent testimony by the party upon whom rests the burden of proof, which is upon the plaintiff in this case. While fraud may be proven by circumstances, yet, where the transaction under consideration may as well consist with honesty and fair dealing, it will be referred to the better motive." [Elzea v. Dunn, 297 Mo. 690; Jones v. Nichols, 280 Mo. 653; Garesche v. MacDonald, 103 Mo. 1; Hardwicke v. Hamilton, 121 Mo. 465; Warren v. Ritchie, 128 Mo. 311; McGrath v. Payne, 245 S. W. 1061.]

The only question on this appeal is whether defendant wilfully caused his hand and foot to be run over by the cars. The only direct testimony on this subject is the testimony of the defendant himself, whose deposition the plaintiff took and read in evidence. This deposition covers every material fact and circumstance in the record which could throw light on the controversy or test the accuracy and truth of Underwood's story. It is true, defendant's story is unusual, and for that reason, we have approached its examination with caution and scanned his

testimony with unusual care. We have set out the substance of it in our statement of the case. We are satisfied that his story is true, and that he was bound and gagged and tied to a railroad track by the robbers and run over by the cars, and that he lost his hand and foot in the manner stated by him. He was the only witness produced by the plaintiff who testified to the happening of the injury. His testimony is straightforward, natural and consistent with itself. He presistently and consistently denies the charges against him. Because his story may be unusual, and he persists in maintaining its truth, is not sufficient evidence to show that it is false and that the plaintiff has maintained the onerous burden of proof, which the law in such cases casts upon the plaintiff—i. e., to show its falsity, *beyond reasonable doubt, by clear, cogent and convincing testimony.* Under like circumstances, this court has said, per WOODSON, J., in Manchester Bank v. Harrington, 199 S. W. 242: "It will suffice to say, however unusual that story may appear to be, the only evidence regarding them came from the mouths of respondent's own witnesses, and there is not a scintilla of affirmative testimony in this record tending to show their non-existence. . . . The sole contention of counsel for respondent, in favor of the negative of that claim, is based, as before stated, upon the alleged incredibility of their story. . . . All the authorities hold that the burden of proving fraud rests on those who charged its existence, and this case is no exception to the rule. . . . The plain English and common sense of this rule is this: That where the burden of proving a fact in a case rests upon the plaintiff, and he introduces witnesses to prove that fact, who throughout their testimony consistently denied the existence of that fact, then in neither law nor fact can it be said the fact has been proven, no more in my opinion, than if no evidence whatever had been introduced upon the point; the legal effect of such testimony, if it has any, being consistent throughout, however unusual the transactions to which it refers may be, is to disprove, rather than to prove that fact. [Rodan v. St. Louis Transit Co., 207 Mo. 408, 105 S. W.

1061.] In the case at bar, we are fully satisfied from this record, that the respondent wholly fails to make out its case.''

So, in the case before us, the testimony of Underwood, which is the only evidence as to how he lost his hand and foot, although unusual, is consistent throughout and disproves plaintiff's charges against him, and we must hold that the plaintiff has failed to make out its case.

II. But, it is said that it is wholly unbelievable that defendant should have accidentally lost one foot and one hand so soon after securing such insurance, especially while being robbed, which one policy required, in order to enable him to recover anything, when the injury was inflicted by others; that his almost desperate financial condition would naturally lead him to commit even such a desperate act as to cause himself to be run over by a train in order to lose one hand and one foot in order to secure the handsome sum provided by such policies, which would give him enough cash to pay all his debts, and a substantial sum besides, with a life income of $120 per month and $22,000 paid-up insurance for his wife at his death in certain contingencies and a substantial cash surrender value. But men carry much larger policies of accident and life insurance, and we do not regard the amount taken out in this case, under the circumstances, as persuasive evidence of a fraudulent purpose. There is no evidence that he was hard pressed by his creditors or threatened with foreclosure or suit by them. But, on the contrary, while he owed more than his property would justify, from a strictly business standpoint, his creditors knew him well, and they apparently regarded him as an honest, hard-working man, doing several different kinds of business—running two or three jitneys, a straw-and-hay bailer, and a restaurant and rooming house. He was not so hard pressed as to *seek* insurance of any kind, but he was persuaded into taking it by the reasonable and proper efforts of the insurance agents, on the ground that he was running the jitney

*Indebtedness.*

business, which was hazardous to life and limb. He is not to be judged by the hard-and-fast rules governing conservative and careful business men. His testimony and history, in the record, show that he did not keep close account of his affairs and that he was optimistic and hopeful, no doubt somewhat reckless in business and did not hesitate making an overdraft on his bank. And the testimony of at least one of his bankers shows that he was almost equally optimistic and hopeful—if not reckless—in permitting him to overdraw apparently *ad libitum*. That he did not seek any insurance is a very potent circumstance to show he did not fraudulently procure any. We so regarded such fact in the Frumson Case, supra, where we said (236 S. W. l. c. 316): "He does not seem to have sought insurance on his life but the representatives of the various companies with their usual and proper diligence seem to have sought him."

We rule this point against appellant.

III. · It is not, and cannot be contended, that defendant intended to commit suicide, but it is claimed that his purpose was to secure the benefit of the insurance himself during his lifetime. The principal benefit, the annuities, would not accrue to him or anyone **Robbery and** in the event that he was killed. It would **Murder of** seem reasonable, therefore, that had de-**Victim: Suicide.** fendant simply intended to lose a hand and foot, so as to enjoy the annuities, he would have taken some pains to accomplish his purpose without seeking almost certain death by attempting to extend and keep one hand and one foot under the wheels of a moving train in the dark, as suggested by plaintiff.

It is true, defendant's·story is unusual, but not impossible. Robbery and murder, with and without cause, in almost all conceivable ways, have been of almost daily occurrence, during the last few years, especially in or near large cities, owing, largely, we have no doubt, to the ease with which criminals can capture and carry off their victims and escape in automobiles, and· the apparently

increasing lawlessness of the times.  [State v. Affronti,
238 S. W. 1. c. 111-112.]

The crime for which Affronti, a bandit from Kansas
City, was convicted, was for the brutal robbery of some
aged women in their home in Clay County.  His case was
on trial at Liberty the day defendant says he was robbed
and run over.

That defendant might lose one hand and one foot,
while being robbed, was evidently not considered wholly
improbable by the insurance companies, because it was
only in such contingency that Underwood would receive
any benefit under one of his policies for an injury inflicted
by others.  Indeed, it would seem to be but prudent to
insure against automobile accidents, including injury in
being robbed by persons using automobiles.

IV.  The appellant contends that defendant deliber-
ately removed his left shoe, wired it to the rail, and then
as the train came along, put his naked foot under the
wheel—*because his shoe was cut in two, and there was
no blood in or on it,* we do not think this follows.

Shoe: No Blood.  Mrs. Snedden testified that his foot was bleeding
but very little, just an occasional drop, when he
first got to their house.  That he had his sock on his foot,
but no shoe.  The other testimony showed that the next
morning his left shoe was found with wire around it,
showing it had been wired to the east rail, mashed di-
agonally from the back of the heel, across the instep, and
cut completely in two across the shank and instep.  Also
torn or cut from the toe to the top of the upper.  The
shoe was filed with us for examination.  His foot, however,
we are satisfied from the evidence, had not been severed,
but was mashed from the back part of his heel diagonally
across the instep, by the wheels which ran over it, ap-
parently in the same manner and place as his shoe was
mashed. It seems to us, therefore, reasonable to conclude,
that he had his shoe on when the wheel ran over it, as he
testified he did.  It would have been almost impossible for
him to have tied his empty shoe to the rail, and then placed

his foot on the rail in the dark, in such position, that both would be run over and mashed in the same way and place. But, on the other hand, it would not seem impossible for him to jerk his foot out of his shoe in the struggle to free himself, and for the shoe to remain on the rail to which it was tied or wired and be run over and cut in two after he pulled his foot out. It might be that only one wheel of the tender—the engine was running backwards—passed over his foot, and that this would not necessarily cut his foot off, if he had his shoe on. In that case, the rubber heel on his shoe might to a certain extent have protected and eased the blow to his foot.

We rule this contention against plaintiff.

V. It is also said that, although defendant testified that he made an outcry after the robbers left him, and before he was run over, his outcry was not heard by the Snedden family, who would have heard him then, as well as after he was injured. But this is a *non sequitur*. It was but a short time after the departure of his assailants until the cars came, and many things may have prevented his outcry being heard at that time by the Sneddens, although they heard him afterwards. Their house was an eighth of a mile away.

*Unheard Outcry.*

VI. Plaintiff also contends that numerous pipes and bolts and other parts of the engine and tender came so close to the rail and over the place on the track where defendant said he was lying when the train passed over him, that he could not have escaped death or other injury. But defendant's testimony is that, as the train approached, he put his head on the ground, pulled away from the rail and laid down as flat as possible with his left arm and foot still tied to the rail. A careful study of the measurements of the engine and tender referred to does not make it impossible, under the circumstances, for the defendant to have escaped without other injury than as stated by him. Besides, measurements of a companion engine by defend-

*Shielding Body.*

ant's witness, the county surveyor, showed that it was entirely possible.

VII. Appellant also urges that the evidence shows that there was an apparently freshly made depression at the end of the ties in the ballast in which the defendant could have placed his body and from which he could have **Depression** extended his hand and foot under the wheel **in Ballast.** without injury to the rest of his person. The evidence is somewhat conflicting. One of the witnesses saw no such depression. But Mr. Snedden, who seems to have been without bias or preconceived theory, testified that there was some depression, which seemed to have been made by *tramping* the ballast down at that point as if by men "in working, or doing something, around there." This is consistent with the depression having been made or increased by the tramping of the ballast while the bandits were there guarding and tying the defendant to the rail.

VIII. It is also said that the wire was old and rotten and easily broken, two pieces in evidence, having been inadvertently broken by the attorneys in handling it during the trial in this and the lower court, and it could not have held defendant to the track, if he had attempted to break **Old Wire.** loose. No doubt some of it was easily broken in places. Defendant testified that he soon broke it in one place and released his right arm, but before he could break it again the train came. That it was not all easily broken is shown by the fact that the piece around defendant's arm could not be untwisted by Snedden, but had to be slipped down over defendant's injured hand. That piece has been examined by the court, and while old, it is firm and strong. So some of the wire produced by the witnesses may not have been used in tying Underwood, but discarded pieces, left by the robbers on the track where the witnesses found most of it.

So the fact that defendant's body was not scratched at any place by the barbs on the wire, is not conclusive

that he was not tied therewith.  He had on a woolen coat and trousers, and also an undershirt and drawers which covered the places where the wire was tied upon him. The trousers and coat were torn in several places and punctured in five or six places, as if by barbed wire.  The barbs, as well as the wire, were old and perhaps not sharp enough to penetrate  his woolen clothing and underwear sufficiently to perceptibly scratch his body.

IX.  Other circumstances:  The auto tracks discovered the next morning by Mr. Snedden at the place where defendant said the bandits stopped their car near the fence and backed it out and returned towards Excelsior Springs corroborate defendant's statement in that regard.  The machines which came there after the injury that night are not definitely shown to have stopped and backed out at this place, but rather nearer the Snedden house.

Other Circumstances.

Learned counsel for appellant do not claim, but disclaim, that defendant had any confederates.  They contend that he carried out his alleged fraudulent scheme unaided by anyone.  They also contend that self-injury was premeditated on defendant's part.  If so, it seems to us to be reasonable that he would have gone to the track prepared with material to tie himself.  But all the evidence agrees that the wire with which he was tied, was taken from the fence or found on the ground nearby.  It would seem to have been an impromptu, not premeditated, affair.

That defendant had no accomplices was no doubt ascertained by plaintiff to its satisfaction by the diligent investigation the evidence tends to show it made after defendant's injury, to ascertain the facts in the case.  But, it seems to us, that such diligent search by plaintiff also tends to strongly corroborate defendant's account of his injury, because it fails to show the discovery of any facts to contradict the defendant's story.  Indeed, we hold that the statement testified to by Snedden, that defendant told him he had been robbed and tied to the railroad track

301 Mo.—8

by the robbers, being made immediately after the injury, while defendant was still lying on the track and calling for help and for a physician, is part of the *res gestae,* and as such is competent evidence of the truth of the facts there stated by defendant, independent of the testimony of defendant in his deposition.

Other suggestions have been made by appellant, which we have considered, but need not be referred to specifically. Suffice it to say, we find all the circumstances in the record may consist with the integrity of the defendant's account respecting his injury.

We think the truth of the case is with him.

X. It is most vigorously argued that the presumption is against the defendant, because he failed to go upon the witness stand and testify on his own behalf at the trial of the case. But, as we have already seen, his deposition was taken and read in evidence by the plaintiff. It covered over three hundred pages of the record, and in it the defendant was fully interrogated, and fully testified, as to all the material facts and circumstances bearing on the case. There was, therefore, no reason for his going upon the witness stand and testifying again. Under such circumstances, the rule, that there is a presumption against a party charged with fraud who fails to testify and defend himself against such charge, does not apply, because he has not failed to so testify and defend himself. His deposition when read by his adversary is as efficacious for his defense as if he had gone upon the witness stand and testified on his own behalf to the matters contained therein. He is not required to testify twice to prevent a presumption arising against him from failing to testify once. [Lamport v. Assur. Co., 272 Mo. 19, l. c. 39; Clapp v. Kenley, 277 Mo. 391-2.]

Being satisfied of the truth of the defendant's testimony as to the manner of his injury, we not only hold, that plaintiff has failed to make out a case, under its petition, but that defendant has sustained the allegations of his cross-bill.

The judgment below is, therefore, in all things affirmed.

PER CURIAM:—The foregoing opinion by Small, C., is adopted as the opinion of Court in Banc. All of the judges concur, except *Woodson, C. J.,* who dissents.