JOHN W. JARVIS v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant.—37 S. W. (2d) 602.

Division One, March 31, 1931.

*J. C. James* and *Douglas W. Robert* for appellant.

*C. O. Inman* and *W. H. Douglass* for respondent.

ATWOOD, J.—This is an appeal from a judgment rendered in favor of plaintiff, John W. Jarvis, and against defendant Chicago, Burlington & Quincy Railroad Company, for $20,000, on account of injuries alleged to have been sustained by Jarvis at Christopher,

Illinois, while employed by defendant in interstate commerce, which injuries resulted in amputation of plaintiff's right leg about the knee.

The petition alleged that at the time plaintiff was injured he was employed by defendant as a flagman or rear switchman and "was riding on the rear end of a cut of cars in the performance of his duty when said cars were derailed on account of running into a derail switch which had not been thrown," and that the injuries sustained "were caused in whole or in part by the negligence of the defendant, its officers, agents and employees by reason of the defect and insufficiency due to its negligence in the operation of its cars and engines, and the defect in its appliances, machinery, track, road-bed and equipment and in handling the cars at the time." Defendant's answer contained a general denial; a plea that neither plaintiff nor defendant was engaged in interstate commerce at the time plaintiff was injured and that plaintiff's injuries were caused by his own negligence; and the answer further pleaded the Workmen's Compensation Act of the State of Illinois as a defense. Plaintiff's reply was a general denial.

Before this appeal was heard respondent filed an additional abstract and record, as he had a right to do under Section 1479, Revised Statutes 1919. [Pullis v. Somerville, 218 Mo. 624, 634.] Appellant filed objections thereto in writing, and prayed that "an order issue to the Clerk of the Circuit Court of the City of St. Louis, commanding him to send to this court the bill of exceptions in this cause, or a certified copy thereof, as provided by Section 1479, Revised Statutes 1919." The section cited authorizes such an order only when it appears that part of the record is in dispute. The abstract filed by respondent is designated on the cover page as "Respondent's Additional Abstract and Record," and purports to present in full the testimony of certain witnesses as the same appears in defendant's term bill of exceptions. An examination of appellant's abstract discloses that it presents in full only parts of the examination and testimony of these witnesses and only purports to give the substance of the remainder. Appellant's objections cover a wide range and dwell largely upon matters alleged as appearing in defendant's bill of exceptions and not included in respondent's additional abstract. Of such omissions, if any there be, appellant is in no position to complain. Upon it was imposed the duty of filing a sufficient abstract. Appellant does not assert that any of the matters presented in respondent's additional abstract do not appear in its bill of exceptions. The matters so presented by respondent are not controverted, disputed or put in issue by appellant's objections. Therefore, the objections are overruled and respondent's additional ab-

stract is accepted as a correct statement of the matters contained therein. [Eliot v. Railroad, 204 Mo. 1, 12, 102 S. W. 532; Woods v. St. Louis & S. F. R. Co., 187 S. W. 11, 14; Hayes et al. v. McLaughlin, 217 S. W. 262, 264.]

Before filing his reply plaintiff filed motion in the circuit court to strike out parts of defendant's answer setting up the Workmen's Compensation Act of the State of Illinois as a defense. This motion was sustained and appellant assigns the ruling as reversible error. Appellant abstracts the grounds of this motion as follows:

"For grounds of said motion the plaintiff says that said matter alleged in defendant's answer as above set forth does not constitute a defense to plaintiff's action.

"That plaintiff has predicated his right to recover on the ground that he was employed in interstate commerce at the time injured, and this matter constitutes no defense as the disproof of that fact would defeat plaintiff's action.

"That the matter pleaded by defendant is an affirmative matter not germane to the issue in this case, as the proof of this matter would have no other effect than disproving the fact that plaintiff was not engaged in interstate commerce as he alleges in his petition and which can be shown under a general denial."

Were these grounds sufficient and well taken? Section 1239, Revised Statutes 1919, provides that only the substantive facts necessary to constitute the cause of action or defense shall be stated in a pleading, and Section 1241 provides that "if irrelevant or redundant matter be inserted in a pleading, it may be stricken out, on motion of the adverse party." True, defendant had a right to incorporate in its answer as many defenses as it might have, provided they were separately stated and consistent with each other (Sec. 1233, R. S. 1919; Darrett v. Donnelly, 38 Mo. 492, 493; Smith v. Culligan, 74 Mo. 387, 389; Lee v. W. E. Fuetterer Battery & Supplies Co., 23 S. W. (2d) 45, 58); but in the face of a motion to strike, the answer also had to comply with these other statutory requirements.

Was the Illinois Workmen's Compensation Act in fact a defense to the cause of action pleaded, or was it irrelevant matter? Appellant cites our opinion in Sullivan v. St. Louis-San Francisco Ry. Co., 12 S. W. (2d) 735, 738, and as suggested by appellant it may be conceded that here, as in that case, the other allegations of the petition were such that with its averments of plaintiff's interstate employment they stated a good cause of action under the Federal Employers' Liability Act, and without them it stated a good cause of action under the common law. Now, if and when

plaintiff pleaded his cause of action as arising under the common law the Illinois Workmen's Compensation Act would have been a proper defense because that act prohibited common law actions, and Section 1162, Revised Statutes 1919, permits the prosecution in this State of a cause of action accruing in another state only when such action is authorized by the laws of such other state. However, at the time plaintiff's motion to strike was sustained, and at all times thereafter, plaintiff's petition contained averments of his interstate employment, so that his cause of action was clearly pleaded as arising under the Federal Employers' Liability Act and not otherwise. The Illinois Workmen's Compensation Act is no defense to a cause of action thus pleaded (Carter v. Railroad, 307 Mo. 595, 606, 271 S. W. 358), and, as the petition then stood, plaintiff's motion to strike this alleged defense from defendant's answer was properly sustained.

But counsel for appellant say that "the mere fact that plaintiff alleged he was employed in interstate commerce would not prevent his amendment by striking out such allegation and proceeding at common law, or the court or jury ignoring the allegation and a verdict being rendered under common law," citing our decisions in Sullivan v. St. Louis-San Francisco Ry. Co., 12 S. W. (2d) 735, 739; Lopez v. Hines (Mo. Sup.), 254 S. W. 37; Pipes v. Railroad, 267 Mo. 385, 184 S. W. 79; Hilderbrand v. St. Louis-San Francisco Ry. Co., 298 S. W. 1069, 220 Mo. App. 1229; Azar v. St. Louis-San Francisco Ry. Co. (Mo. App.), 251 S. W. 453; Wabash Railroad Co. v. Hayes, 234 U. S. 86; M. K. & T. Railroad v. Wulf, 226 U. S. 570, and other cases from other jurisdictions. Answering this contention, and the cases cited in support thereof, counsel for respondent concede that plaintiff's petition might have been so amended, as was done in the Sullivan case, or treated as so amended, as in the Hayes case, or the allegations treated as surplusage, as in the Hilderbrand case, and in such event the cause of action presented for submission under the common law, but they call attention to the fact that none of these things were done, and say that if they had been done defendant would then have been entitled to amend its answer and plead the defense here in question. We think this is a proper differentiation of the instant case from the cases above cited and sufficiently answers appellant's contention. Plaintiff's cause of action was pleaded, tried and submitted on the theory that it arose under the Federal Employers' Liability Act, and defendant's alleged defense of the Illinois Workmen's Compensation Act was, therefore, never relevant. This assignment of error is overruled.

Appellant's next point is that plaintiff was not shown to have been engaged in interstate commerce at the time he was injured. Plaintiff testified that he was in the employ of defendant on July 24, 1926, and was called to work at Centralia, Illinois, for nine o'clock that night. We quote as follows from his testimony as shown in respondent's additional abstract:

"Q. When you were called for nine o'clock, was there any particular time that you were required to report? A. Yes, sir, report thirty minutes before leaving time.

"Q. Did you report for work that night? A. Yes, sir.

"Q. What time did you report? A. Eight-thirty.

"Q. Where did you report to? A. Centralia Yard Office.

"Q. Was that the usual place where you reported for work when you were called? A. Yes, sir.

"Q. When you were called for work that night, did you know what work you were to do? A. No.

"Q. Where did you get your first information as to what you were to do? A. At the yard office, Centralia Yard Office.

"Q. Who gave you that? A. The yard clerk.

"Q. Did you get that in the usual way that you would get information about work you were to do and where you were to work, and what you were to do? A. (No answer.)

"Q. I say, was that the usual way it was done? A. Yes, sir.

"Q. What information did you get at the yard office about what you were to do that night? A. That our train would be made up on number two track.

"Q. Is that all the information you had? A. Yes, sir.

"Q. Did you know what you were to do with this train, or where you were going, or anything of that kind at that time? A. No, sir.

"Q. When you got that information what did you do then? A. Went back down number two track.

"Q. To the point where the train was standing? A. Yes, sir.

"Q. Now, what did you find when you got to track number two? A. Empty coal cars.

"Q. Anything else? A. Yes, sir, the caboose was back at the rear end of them.

"Q. Do you know how many of those coal cars there were? A. The switch list showed ninety-six. I didn't count them.

"Q. What did you then do when you got back there to track number two and found this train of coal cars, empty coal cars? A. I went down the track to the caboose, seen that they was all coupled together, looked at my lamps on the caboose, and then waited.

"Q. Was there an engine hooked onto those cars at that time? A. No, sir.

"Q. Was there one hooked onto it later? A. Yes, sir.

"Q. Now, about what time did that train of cars move—start to move off of track number two? A. Well, I don't know exactly, but about nine o'clock.

"Q. Where were you at the time it started to move off? A. In the caboose.

"Q. Anybody else there with you? A. No, sir.

"Q. Did you know at that time where you were going or what was to be done by you and your crew? A. No, sir.

"Q. Did you afterwards get any instructions as to what your work would be? A. Yes, sir.

"Q. Now, where did you get those; where were you, and just state the circumstances? A. When the conductor got on at the yard office he had the orders.

"Q. Did he tell you there what you were to do? A. Yes, sir; he gave me the orders.

"Q. What were the orders? A. I don't understand your question.

"Mr. Douglas: Q. Mr. Jarvis, this order that I am speaking about is what the conductor showed to you when he got on at the yard office as stated before, as to what your work that night would be? A. Yes, sir.

"Q. Now, what was that order? A. The order was to go to Ziegler and get a train of coal for the north.

"Q. Now, did the conductor get on your train there, on this train of empties there? A. Yes sir.

"Q. At that time were there any orders as to the disposition of those empty cars? A. No, sir.

"Q. Did you know at that time what was to be done with the empty cars? A. Well, unless otherwise instructed, we would take them where we went, and turned.

"Q. Now with reference to the orders, is there any rule governing orders of the work you were to do with reference as to who shall see the orders? A. Yes, sir.

"Q. What is that rule? A. Each member of the crew must see and read the order.

"Q. Was that in force at that time? A. Yes, sir."

It further appears that plaintiff proceeded with this train of empty cars toward Ziegler, and stopped at Christopher to turn the engine around, because there was no way to turn it at Ziegler. While plaintiff was at Christopher on the rear platform of the caboose he received an order from the operator which he read and handed to the conductor. Plaintiff testified: "The order was, on account no room at Ziegler, leave your empties Christopher, go to

Ziegler with engine and way car, clean out Ziegler for the north, fill at Christopher to 6500 tons." Plaintiff was injured while these empty cars were being placed on switch tracks at Christopher. After he was injured plaintiff's crew took him to Herrin and then proceeded to Ziegler, reaching the latter place about 3:15 in the morning of July 25, 1926. The train of loaded cars that this engine and crew were to take north on the return trip was not then fully made up and ready, but it was completed in a short time and the same engine and crew, except plaintiff, which had left Centralia about nine o'clock on the previous evening, as extra 6307 south, began its return trip north from Ziegler with loaded cars, as extra 6307 north.

Counsel for appellant say that "there is no showing that any car had been billed in interstate commerce, or made up into any train at the time plaintiff and his crew started for Ziegler or arrived there." Counsel for respondent insist that such evidence was furnished by an admission made by defendant and by the testimony of its yardmaster and night yard foreman at Ziegler.

Over the objection of defendant's counsel that "there were two separate trips, one consisting of the hauling of the cars from Centralia, which was an intrastate movement, and the fact that the crew expected at the conclusion of that duty to engage in hauling a train containing interstate cars from Ziegler, did not constitute them at the time of the accident, employed in interstate commerce," the following admission made by defendant was offered by plaintiff and received in evidence: "In the train of cars which left Ziegler on the 25th of July, 1926, and was hauled north by this crew, Extra 6307 north, that there was a car or cars containing coal consigned outside of the State of Illinois, used in interstate commerce."

Mr. Walker, defendant's yardmaster at Ziegler testified that he was on duty July 24, 1926, "up to about 7:30 P. M.;" that he left the yard about that time and defendant then had about "127 billed loads and 591 unbilled loads" in the yard, but no cars were at that time grouped up in any train to go. We quote as follows from his cross-examination: ·

"Q. You say there were 127 billed there that night? A. Yes sir.

"Q. When they went out, were those any parts of the cars that went out on extra 6307 north on the next morning, was that any part of that 127? A. Yes, sir."

Mr. Kraus, defendant's yard foreman at Ziegler, who apparently was on duty the same evening after Mr. Walker left at 7:30, testified that he was in the process of grouping loaded cars when the operator at Christopher informed him about ten o'clock "that there

was a train arriving in Christopher coming to Ziegler with a train of empties, and he wanted a train of loads for the north at that point." When Mr. Kraus informed the operator that the yards at Ziegler were so occupied with loaded cars that he could not take care of a train of empties without causing delay, the operator talked to the dispatcher and Mr. Kraus was informed that the empties would be cut out at Christopher and the engine and caboose would come over and he was to have 25 loads ready for them to go· north and they would then go to Christopher and get the rest of the train load. Mr. Kraus further testified that he did not know how many cars that train took out of Ziegler or when it left, because he went off duty at four o'clock; that he did not give the train crew a list of the cars that they were to take out when they went, that the yard clerk did this, but that the cars were all ready for the engine and caboose to be coupled on when he left the yards.

Assuming, without holding, that Yardmaster Walker's testimony above quoted was evidence that the train of cars taken out of Ziegler by extra 6307 north in the early morning of July 25th was made up entirely from the 127 cars that were billed before 7:30 o'clock of the previous evening, and that defendant's admission that this train, extra 6307 north, contained one or more loaded cars billed in interstate commerce, was properly in evidence, yet it does not appear from the record before us that the loaded cars composing this train were finally grouped, made up or assigned for that particular movement until the engine, caboose and crew reached Ziegler some time after three o'clock in the morning of July 25th, about six hours after plaintiff's train left Centralia and several hours after plaintiff was injured. The conductor's order, produced about nine o'clock as his train was moving out of Centralia, was "to go to Ziegler and get a train of coal for the north," but it contained no direction to include an interstate car or cars, and there is no evidence that any such car or cars had at that time been assigned to or grouped for this particular train movement. The contrary in fact was shown by Mr. Kraus who testified that at nine o'clock none of the cars whatever had been grouped and no train made up. He further testified that around ten o'clock, when extra 6307 south was at Christopher, which was about the time plaintiff was injured, he "was in the process of grouping them," but that the grouping was not completed and the train made up and ready until after three o'clock on the following morning.

How can we say that plaintiff was engaged in interstate commerce at the time he was injured when there is no proof that either at that time or at the time the order was received at Centralia any interstate car or cars had been grouped or assigned to his en-

gine and crew for movement? A train crew proceeding under an order merely to move a car intrastate is not employed in interstate commerce unless and until such car is billed, designated or assigned for use in interstate commerce. For illustration, while the hauling of an empty freight car from one state to another is interstate commerce, yet, as ruled in Gulf & S. I. R. Co. v. Curtis, 113 So. (Miss.) 195, 196, "the interstate character of such a car begins when, and not until, it has been designated therefor, and has begun to move for the purpose of being put into a train of the cars, or attached to an engine, that would carry it forward on its journey." Also, in Roberts' Federal Liabilities of Carriers (2 Ed.), 1455, it is said:

"It is essential, however, that the equipment being prepared for service or movement shall have been definitely assigned or designated for interstate work. Unless such assignment or designation appears, there is no basis for asserting any such relation with interstate transportation as will bring the employee concerned under the protection of the act."

The same course of reasoning suggests that a train crew proceeding under an order merely to move a train of cars intrastate is not employed in interstate commerce unless and until one or more interstate cars are assigned to that crew for movement. The order is merely to move a train of cars which may or may not be in interstate commerce, depending upon whether or not the train will include one or more interstate cars. Until the train itself thus becomes an instrumentality of interstate commerce nothing preparatory to or in aid of its movement is interstate commerce. In Poindexter v. C. C. C. & St. L. Railroad Co., 4 S. W. (2d) 1065, 1067, 319 Mo. 285, certiorari denied by the Supreme Court of the United States, 278 U. S. 622, we held that one killed while repairing or replacing knuckle on intrastate car preparatory to coupling it with intrastate and interstate cars in order that all could be hauled with one movement from one railroad yard to another, was not engaged in interstate commerce, it not appearing that the intrastate car upon which deceased was working had been put into an interstate train up to the time of his injury.

Counsel for respondent emphasize the *purpose* of the movement from Centralia to Ziegler, but there could be no purpose to aid or engage in interstate commerce until some instrumentality of interstate commerce was definitely assigned to that movement. The case is thus distinguishable from L. & N. Railroad Co. v. Parker, 242 U. S. 13, cited by respondent. Youngstown & O. Railroad Co. v. Halverstodt, 12 Fed. (2d) 995, is also cited by respondent as "illustrating how 'orders' impress a movement with its character of interstate or intrastate commerce," but it differs from the instant case in that the order was actually carried out by the move-

ment and incomplete switching of interstate cars followed by subsequent completion of the switching operation, in which latter movement the plaintiff was injured. Respondent also cites O'Donnell v. Director General of Railroad, 273 Pa. 375. There an engineer was ordered to take a certain engine from one station to another where it was already assigned to haul an interstate train, and after its delivery the engineer was to take charge of another engine attached to an interstate train and assist in that movement. The engine left the track and the engineer was killed before meeting either of these assignments. He was held to have met his death while employed in interstate commerce because he was then moving toward assignments *then definitely characterized as interstate commerce*—which latter feature distinguishes it from the instant case. McDonald v. Railroad Co., 279 Pa. 26, cited by respondent, is likewise not in point, because the purpose of the employment in that case, according to this opinion, "was to operate a train from a point in one state to a point in another," an assignment to employment clearly in interstate commerce when made.

Having pleaded his cause of action as arising under the Federal Employers' Liability Act the burden was upon plaintiff to prove that he was employed in interstate commerce at the time he was injured. [Lucchetti v. Philadelphia & Reading Ry. Co., 233 Fed. 137.] We conclude from a careful study of the record before us that this proof was not made either on plaintiff's evidence or on the whole case, and defendant's requested instructions in the nature of demurrers to the evidence should have been given. In the light of this conclusion we deem it unnecessary to rule the remaining assignments of error urged by appellant.

The judgment is reversed. All concur.