STANLEY SHIDLOSKI, Administrator of the Estate of ALEXANDER SER-
WATKA, v. NEW YORK, CHICAGO & ST. LOUIS RAILROAD COMPANY,
a Corporation, Appellant.—64 S. W. (2d) 259.

Division One, October 19, 1933.*

*Jones, Hocker, Sullivan & Gladney* and *Willard A. McCaleb* for
appellant.

---

*NOTE: Opinion filed at May Term, 1933, August 24, 1933; motion for
rehearing filed; motion overruled at September Term, October 19, 1933.

*Louis E., Miller, John F. Gibbons* and *Charles A. Lich* for respondent.

ATWOOD, J.—Stanley Shidloski, administrator of the estate of Alexander Serwatka, deceased, obtained a judgment for $15,000

against the New York, Chicago & St. Louis Railroad Company, commonly known as the Nickel Plate Railroad, on account of the death of Serwatka which resulted from his being struck by a string of cars while he was employed by said railroad as a car repairer in its yards located at Madison, Illinois.

The action was brought under the Federal Employers' Liability Act. The existence of a well-established custom to warn employees working in and about cars in said yards of the movement or intended movement of cars to be switched or coupled therein was pleaded, and it was further alleged that the injuries inflicted upon and death resulting to the deceased were directly and proximately caused by the negligence and carelessness of defendant in failing to give the deceased any warning or signal of its intention to move the car or cars then and there upon repair track number 5, and in failing to make any inspection either under or about the cars where the deceased was working before moving said car or cars, when defendant knew, or by the exercise of due care on its part could and should have known of the presence of deceased in and about said repair track number 5 in time thereafter to have warned him of its intention to move said car or cars and thereby have avoided striking and injuring him.

Defendant admitted in its answer that on the occasion mentioned in plaintiff's petition the deceased was employed by defendant and that on May 9, 1929, he died as the result of injuries received on May 8, 1929, but denied each and every other allegation, statement and averment contained in said petition; and further stated that his death "was caused by his negligence in walking between two uncoupled cars when he knew, or by the exercise of ordinary care could have known, that the switching crew was at the time handling and moving said cars," and that his injuries and death "resulted from the ordinary risks, hazards and dangers of the occupation in which he was engaged, or those risks, hazards and dangers which were then and there open and obvious, and which he knew, or by the exercise of ordinary care on his part could have known, all of which risks, hazards and dangers were assumed by him."

Plaintiff's reply was a general denial. Demurrers to the evidence were offered by defendant and refused by the court at the close of plaintiff's case and at the close of the whole case.

Defendant's yards at Madison were only used for "light repairs," that is, repairs under fifty dollars. There were six repair tracks, parallel to each other, running east and west and numbered from 1 to 6 commencing on the north. All supplies for freight cars were kept south of track number six. A small supply track about twenty-four inches wide ran east and west about midway between tracks 4 and 5, and a walk about ten or twelve feet wide extended from track 6 north to the north rail of track 1 near the center of these tracks and was kept open for use of car repairers in going from one

track to the other and in rolling car wheels in connection with repairs. The deceased and a fellow car repairer named Deski ordinarily worked together and were so engaged the night of this accident. Their hours were from three o'clock in the afternoon until eleven o'clock at night. Deski's deposition was taken and read in evidence by plaintiff. He testified that when he and Serwatka commenced working on track 6 about eight o'clock that night there were five cars on this track; that he was fixing up the train line or air pipe on the first car while Serwatka was restenciling weight numbers on the second car right next to him; that they were informed as to the work they should do by the notation on the bad-order card attached to each car; that the card attached to the car on which he was working called for repair of the train line, while the card attached to the car on which Serwatka began work called for restenciling the weight numbers and checking over the car; that after working about twenty minutes restenciling but before finishing his work on the car Serwatka went away about 10:30 o'clock and did not come back; that he neither saw nor heard anything more of him until later when he was found in an injured condition lying near track 5.

The first point urged by appellant is that "the evidence was wholly insufficient to show that plaintiff's deceased was engaged in interstate transportation, or in work as closely related thereto as to be a part thereof, at the time he received the injuries which caused his death."

Having pleaded his cause of action as arising under the Federal Employers' Liability Act, the burden was upon plaintiff to show by substantial evidence that deceased was employed in interstate transportation, or in work so closely related thereto as to be a part thereof, at the time he was injured. [Jarvis v. C. B. & Q. Railroad Co., 37 S. W. (2d) 602, 607, 327 Mo. 428; Lucchetti v. Philadelphia & R. Ry. Co. (D. C.), 233 Fed. 137.]

Recognizing this burden respondent relies on testimony of J. H. Hogg, defendant's general agent who was offered as a witness by plaintiff, that 90721, Erie, and 411353, Southern, were the only two cars on track 6 on the day of May 8, 1929, and that this Erie car was an empty freight car received from the Wiggins Ferry Company on May 8th and sent home to the Erie at Ohio City, Ohio, on May 9th, while the Southern car was received from the Wiggins Ferry Company on May 7th, loaded with pipe fittings from Bessemer, Alabama, destined to Newark, New Jersey, and "went to Newark, New Jersey, on May 8th." From this testimony plaintiff argues that inasmuch as witness Deski testified that he was working on the first car on track 6 and Serwatka was working on the second car on the same track when he left his unfinished work and was injured, it necessarily follows that the deceased was working on one or the other

of these two cars, both of which plaintiff contends were then being used in interstate transportation.

In stating that the Erie and Southern cars were the only cars on track 6 on the day of May 8th General Agent Hogg testified from the daily track check which he said was made by defendant's mechanical department "prepared by the car foreman, a man by the name of Dant; I am not just certain what hour of the day he takes this check; I presume when he goes to work in the morning." Plaintiff's witness Deski testified that Dant was their day foreman, that he was on duty from six o'clock in the morning until six o'clock at night, and that the switching of cars on and off the repair tracks was done at night. Hogg's testimony fails to show that these Erie and Southern cars were not moved off this track and other cars put on after six o'clock and before Deski and Serwatka went to work on that track about eight o'clock that evening. Neither does any of his testimony show that any repair work was done on either of these cars after six o'clock that evening.

The only other evidence offered in chief by plaintiff on this point was the testimony of Deski, an unnaturalized Pole who expressed himself with difficulty and at times in contradictory terms. He said that after finishing all repairs on track 5 that evening he and Serwatka found five cars on track 6 when they went to work there about eight o'clock and proceeded with their work as above stated. With reference to placement of these cars he testified as follows:

"Q. When had these cars been run in on track 6, to be repaired, do you know—when were they put on the track, the ones you and Alex were working on, track 6, the first and second car, when were they put on the track? A. Put them on the track another night.

"MR. REEDER (Q): Were the cars on 6 when you went to work? A. Yes.

"MR. REEDER (Q): They were already there? A. Yes.

"Q. All right. Now then, the night before, were those same cars on 6? A. No. They put them on at night.

"Q. They put them on at night, you say? A. Yes, sure; that No. 6 track, put them on at night. Don't put them on day.

"Q. Don't put them on day? A. No. . . .

"Q. Were there different cars on track 6 on May 8th than there were on May 7th? A. No. They come at night when they started to work, the same night.

"Q. In other words, these two cars on track 6 were put on there the same night you worked? A. Yes.

"Q. When were they taken off, the same night or the next night? A. No.

"Q. Taken off same night? A. Yes.

"Q. Put on same night, fixed same night; taken off same night; is that right? A. Yes.

"Q. You say Clinton was the boss there that night? A. Yes."

Elsewhere in his direct examination the following questions and answers appear:

"Q. When did you see Dant that night, what time? A. Dant no work at nights boss.

"Q. Then was there no boss there that night? A. The regular night foreman went to Cleveland that night and Clinton was there that night.

"Q. Did Clinton tell you what to do on the car? A. He just writes up what they do.

"Q. All right. When you finished track 5 and go to track 6, who told you to go to track 6 to work? A. Engine push 'em up another car to the rip track, work car.

"Q. Who told you to go to track 6 to work? A. Me go myself.

"Q. You go over yourself? A. Yes.

"Q. You knew it had to be done? A. Sure, I knew the car on track 6 had to be repaired, push in on the rip track.

"Q. Now, how did you know what to do, what repairs to make on those cars, what to fix, who told you? A. Me look at them on the bad order card then go fix 'em up. . . .

"Q. And what track did you see them couple them up on? A. Six and five couple them up.

"Q. You saw them couple them up on track 5? A. Sure.

"Q. When you finished on track 5, then you could see them couple them up on track 5, is that right? A. Yes.

"Q. And that was when you were working on track 6? A. Yes.

"Q. You saw them couple them up on there? A. Yes."

Deski's conflicting statements do not amount to substantial proof that the Erie and Southern cars that were the only cars on track 6 at six o'clock on the night of the accident were among the five cars that were on that track when he went to work there about eight o'clock on the same night. [Adelsberger v. Sheeby, 332 Mo. 954, 59 S. W. (2d) 644, 647.] Even if it could be said that under plaintiff's case in chief there was no proof that these two cars were pulled off of track 6 and five other cars put in before eight o'clock that night, and that plaintiff after showing that they were there at six o'clock was entitled to the presumption that these two remained and were among the five cars found there at eight o'clock by Deski and Serwatka when they went to work, still, plaintiff offered no evidence to show that the two cars they were working on were these two.

■ It remains for us to determine whether plaintiff's case was sufficiently aided by defendant's evidence to make a case for the jury on the question of whether or not at the time he was injured deceased was employed in interstate transportation or in work so close-

ly related thereto as to be a part thereof. In so doing we must bear in mind that defendant was entitled to have this issue tried under Federal rules and decisions which do not recognize the "scintilla" rule of evidence. [C. M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 474; Pennsylvania Railroad Co. v. Chamberlain, 288 U. S. 333, 340, 341, 343.]

Car foreman Dant, produced .as a witness by defendant, testified that his hours of work were from seven o'clock in the morning until six o'clock in the evening; that he left the yards about six o'clock in the evening of May 8th and learned of Serwatka's injuries that evening. On cross-examination he said that all repairs had been finished on all the tracks. He was then further interrogated and testified as follows:

"Q. Then what were Serwatka and Deski doing after you left? A. They repaired a couple of cars that was brought in after we went home.

"Q. In other words, they had gotten all their work done up until six o'clock? A. They went out in the yard to fix cars on a rush train, and then came back and went to work on cars that were left in the yard.

"Q. Now, they started to work at 3 o'clock in the afternoon? A. Yes, sir.

"Q. What tracks did they work on? A. I don't recall. They finished up 4 and No. 3. On 6, they had two cars on 6 to work.

"Q. Two cars on 6 to be worked at the time you left? A. Yes, sir."

This witness was later recalled to the stand and testifying from "Defendant's Exhibit 2," which he identified as the daily report of bad-order cars, he said that this report showed only two cars on track 6 when he went home that evening, being "90721, Erie Box; 411353, Southern Box, both o. k.," that is, all repairs made and ready to be taken off the track. He further testified from "Defendant's Exhibit 3," identified as the daily track book kept by him, that the two western cars on track 6 in the early morning of May 9th were 19390, Nickel Plate automobile car empty, and 86166, L. V., box car empty, and there was no evidence that these two cars were then being used in or had been designated for interstate transportation.

Car inspector Clinton, who was acting as night foreman at the repair tracks the night deceased was injured, testified that he saw Deski and Serwatka that evening shortly before this accident occurred at the head of track 6. When asked what "was being done there at the head of those two west cars in track number 6," he said: "There were some new cars to be repaired. They were just preparing to work on them." He said that later he noticed the air tester attached to the knuckles on the west car on track 6. Near the close

of his testimony, on redirect examination, the following question and answer appear:

"Q. Were those two cars on track 6 the last work that Mr. Serwatka and Mr. Deski had to do? A. That is all I know of."

Switch foreman Bruder testified that he went on duty at 3:45 o'clock in the afternoon and that he and his crew did all the switching on the repair tracks the night deceased was injured; that the first time they got into these repair tracks, from 1 to 6, was sometime between six and eight o'clock; that the first track they pulled was track number 6 from which they took some cars and put in about five others on the same track.

Counsel for respondent say that car foreman Dant's affirmative answer to the question "Two cars on 6 to be worked at the time you left," above quoted, is substantial evidence that repairs on the Erie and Southern cars were unfinished at six o'clock that evening. This interpretation is at variance with every related fact shown by defendant and part of plaintiff's own proof. We have already alluded to the fact that plaintiff proved by defendant's general agent that the Southern car "went to Newark, New Jersey, on May 8th." If so, it must have been on the switch list turned over that evening by the mechanical department to the transportation department, for this witness testified to such "a list that the mechanical department make up each evening for the yardmaster, to indicate to him what cars they want taken off of that track, removed from it. . . . Cars that are ready to go, the repairs have been made on them, and they are ready to be taken off of there and sent out." Earlier in his testimony Dant said that all repairs had been finished on all tracks when he left at six o'clock. Later when recalled to the stand he referred to the daily report of bad order cars, which had previously been produced and identified, and said that it showed that all repairs had been made on both the Erie and Southern cars and both were ready to be taken off the track when he left about six o'clock that evening. The switch foreman testified, without contradiction, that he moved cars off of track 6 and put about five other cars on the same track between six and eight o'clock that evening. So, when the question and answer in Dant's testimony thus relied on are considered in the light of their context, plaintiff's own evidence, and other uncontradicted evidence adduced by defendant, the probative value of his answer, for the purpose now urged, has scarcely the weight of even a scintilla of proof. From Dant's testimony considered as a whole we think it can hardly be said that he intended to convey any such meaning as that now urged by respondent. Moreover, there was uncontradicted record evidence of the most convincing kind to the contrary, introduced by plaintiff as well as by defendant, which utterly destroyed the force of any chance verbal state-

ment that might otherwise be construed as inconsistent therewith. [Waters v. Ins. Co., 50 S. W. (2d) 183, 188, 189, 226 Mo. App. 1188.]

Nor should any importance be attached to counsel's suggestion that the last question and answer of car inspector Clinton's testimony, above quoted, shows that these Erie and Southern cars were on track 6 for repairs to be made after six o'clock. The two cars referred to in this question and answer are clearly the two earlier mentioned in Clinton's testimony as having been seen by him at the west end of track 6 shortly before the accident and upon which Deski and Serwatka were then about to begin work.

Finally, it is urged in behalf of respondent on this issue, that "defendant had within its custody and under its control, records made at the time of the repairs, showing not only the character of repairs made, but the employee who worked thereon," and "the fact that the defendant had within its records and under its control this information and, in effect, suppressed it or refused to produce it, gives rise to the inference that its production would have been exceedingly damaging to the defendant." The doctrine relied on is thus generally stated in 22 Corpus Juris, section 54, page 113:

"Where a party to judicial proceedings suppresses documents which are relevant to the matter in question and within his control, such as books of account, records, letters, written agreements, leases, drafts, bills of lading, memoranda, notices, maps, or blue prints, there is a presumption that the suppressed evidence would injure his case."

The only evidence offered by plaintiff to show that any such record was kept were Deski's statements that "I guess the boss knows the name of the car;" that "the boss got on a paper;" that "he just writes up what they do;" and that "the regular night foreman went to Cleveland that night and Clinton was there that night." As already observed, the burden was upon plaintiff to show that the deceased at the time he was injured was engaged in interstate transportation or in work so closely related thereto as to be a part thereof. Plaintiff, having failed to carry this burden by making out a prima facie case in chief, was entitled to no inference in his favor requiring defendant to produce this record, even if such existed. However, there is nothing in the entire record that even suggests the suppression of any evidence by defendant. On the contrary, defendant placed Clinton on the stand and by his testimony, in connection with plaintiff's own proof by witness Hogg that the Erie and Southern cars were not on track 6 on the morning of May 9th, Dant's testimony that the two western cars on track 6 in the early morning of May 9th were the two empty cars 19390 Nickel Plate automobile and 86166 L. V. box, neither of which was shown to have been then in use in interstate transportation, and Bruder's testimony that after he pulled off the Erie and Southern cars and put about five others

on track 6 between six and eight o'clock no other cars were placed on that track that night, made competent proof not only that deceased could not have been working on either the Erie or the Southern car at the time he was injured but that he was in fact working on one of two other cars neither of which was shown to have been then in use in interstate transportation. If plaintiff's counsel had cared to interrogate Clinton as to his keeping of any records or to call for their production at the trial they had ample opportunity to do so, and from their silence in these respects we can only infer that they had no such desire.

The true rule as to an adverse party's duty to produce testimony is thus well stated in Bahl v. Miles et al., 6 S. W. (2d) 661, 664, 222 Mo. App. 984:

"It is true, where matters charged against a party are peculiarly within the knowledge of the party charged, the failure of such party to appear and testify at the trial carries with it an unfavorable and damaging presumption (Parish v. Casner (Mo.), 282 S. W. 392, 412), but this rule of law has no application to a case where the party upon whom the burden of proof rests fails to make out a case. No duty rests upon the party charged to speak until the other party has introduced evidence which, unexplained, makes a case against him (22 C. J. 123; United States v. Cowart et al. (D. C.), 205 Fed. 316, 319; Frohman v. Lowenstein, 303 Mo. 339, 362, 260 S. W. 460)." [See, also, Houghton v. Jacobs (Mo.), 246 S. W. 285, 288; Metropolitan Life Insurance Co. v. Underwood, 301 Mo. 87, 114, 256 S. W. 232.]

On the record presented we are constrained to hold that the evidence was insufficient to take the case to the jury on the question of whether deceased at the time he was injured was engaged in interstate transportation or in work so closely related thereto as to be a part thereof, and the judgment is reversed. All concur.