S. P. RUSSELL, Plaintiff in Error, v. J. S. FRANKS, LAURA FRANKS, GEORGE A. FRANKS, ELMER EXCHANGE BANK, EZRA P. FRANKS and L. E. TANSIL, Defendants in Error.—120 S. W. (2d) 37.

Division One, September 29, 1938.

160

*E. M. Jayne* and *Ed. S. Jones* for plaintiff in error.

*William M. Van Cleve* and *Waldo Edwards* for defendants in error.

BRADLEY, C.—This cause has recently been reassigned. We refer to the parties as plaintiff and defendants as styled below. The object and purpose of the cause is to set aside, as in fraud of creditors, a deed of trust on about 379 acres of land in Macon County, and executed on April 10, 1934, by defendants J. S. Franks, and his wife, Laura. Defendants, George A. Franks, Elmer Exchange Bank, and Ezra P. Franks are the beneficiaries, and defendant Tansil is the trustee. The chancellor below found for defendants; dismissed plaintiff's bill, and plaintiff brought the cause here by writ of error.

Plaintiff alleged, among other things, that J. S. Franks was not indebted to any of the beneficiaries, and that the deed of trust "was voluntary and without consideration and was made by the said J. S. Franks and accepted by said defendants, George A. Franks, Elmer Exchange Bank, a corporation, and Ezra P. Franks, to assist the said J. S. Franks in placing his property out of the reach of his creditors and particularly out of the reach of this plaintiff, and to aid and assist the said J. S. Franks in an effort and scheme to hinder, delay and defraud his creditors and particularly this plaintiff, and that the purported conveyance by the said J. S. Franks rendered the said J. S. Franks wholly insolvent."

Defendant Tansil, in his answer, admitted that he was the trustee named in the deed of trust. The other defendants filed joint answer alleging, in effect, that the notes secured by the deed of trust were bona fide obligations of J. S. Franks, and that 20 acres of the land described in the deed of trust was owned by defendant, Laura Franks, and denied that the execution of the deed of trust rendered J. S. Franks insolvent.

The record shows that, at the time the deed of trust was executed, J. S. Franks owed plaintiff a $1500 note, plus interest, dated January 1, 1926, due in two years, and executed by Vella and Minor King, and J. S. Franks. (The Kings are daughter and son in law of J. S. Franks. They borrowed $1500 from plaintiff and J. S. Franks signed the note as surety for them.) Also, J. S. Franks owed plaintiff a $400 note, plus interest, dated February 27, 1929, due one year, and executed by defendants Ezra P. Franks and J. S. Franks

(Ezra is the son of defendants, J. S. and Laura Franks, and J. S. signed as surety for his son).

Plaintiff, on November 9, 1934, obtained judgments on his notes, which judgments amounted to $2730, and thereafter he filed this cause. In addition to owing plaintiff, as above stated, when the deed of trust was executed, J. S. Franks owed his brother, defendant George A. Franks, a beneficiary in the deed of trust, $1094.22, balance due on a note dated March 4, 1930, due one year; defendant Elmer Exchange Bank, a beneficiary, $1464.40, balance due on a note dated November 3, 1930, and due on demand; the Farmers & Merchants Bank of Ethel about $1200 on two past due notes; and there is evidence that J. S. Franks owed Jack Patton $600. The record clearly shows that, at the time of the execution of the deed of trust, J. S. Franks owed past due debts (excluding the Ezra P. Franks note, mentioned presently) amounting to $6488.62. The deed of trust, in addition to securing the notes held by defendants, George A. Franks and Elmer Exchange Bank, also secured a note for $5692, payable to defendant, Ezra P. Franks, of even date with the deed of trust (April 10, 1934), due on demand, and executed by defendants J. S. and Laura Franks, father and mother of Ezra P. There was no evidence as to the consideration for the $5692 note.

The record shows, with nothing to the contrary, that 20 acres of the land described in the deed of trust was conveyed to defendant, Laura Franks, in 1907, by Samuel and Rose Griffith.

As we view the record, there are two chief questions presented: (1) Should we, trying the cause *de novo*, hold, under the facts, that the $5692 note to Ezra P. Franks was without consideration and was executed for the purpose of hindering, delaying or defrauding creditors? (2) If such was the case, does such fact taint and render void the deed of trust as to defendants, George A. Franks and Elmer Exchange Bank, also beneficiaries in the deed of trust? Also, plaintiff contends that George A. Franks and the Elmer Exchange Bank agreed to discount their notes, if secured, and that notwithstanding this agreement, their notes were secured for the full amount due, and that such made the deed of trust void as to them.

Interrelated with the first question, is the solvency J. S. Franks after the execution of the deed of trust. Plaintiff testified that, shortly prior to the execution of the deed of trust, he had a conversation with J. S. and Ezra Franks (separate, as we understand); that J. S. Franks told him that he (Franks) owed plaintiff, the Elmer Exchange Bank, George A. Franks, and Ray Patton ($600), and these were all he owed. "Q. Did he say anything with reference to owing Ezra Franks anything? A. No, sir, never mentioned it to me in his life." Ezra told plaintiff that all his father owed was plaintiff and the Elmer Exchange Bank.

O. L. Polson, cashier of the Farmers & Merchants Bank, a short time prior to the execution of the deed of trust, had some two or three conversations with J. S. Franks as to his debts, and Polson said that he "never heard him say that he owed" Ezra. November 22, 1930, and March 2, 1932, J. S. Franks gave a financial statement to the Farmers & Merchants Bank, but did not mention any indebtedness to Ezra.

Plaintiff took the deposition of J. S. and Ezra Franks, and introduced part of these depositions. Ezra Franks testified in his deposition that he was not present when his $5692 note was drawn; that he did not know where his father "got the figures in filling out that note for $5692;" that "he never figured it with him just that way;" that he did not know that he knew the amount of the note until it was shown to him; that he saw the deed of trust after it was executed; that his father and mother told him to have the deed of trust recorded and sent to the La Plata State Bank, and that he did so.

In J. S. Franks' deposition he was asked why it was that he did not include in the deed of trust his indebtedness to plaintiff and the Farmers & Merchants Bank, and answered: "Well, just because George Franks and the La Plata Bank (we assume Ethel Exchange Bank debt was meant) offered to knock off some of their —discount their notes, you know." Then when asked "if they offered to discount, why didn't you make it for the lesser amount than the amount the note called for," and answered that he could not tell; "we just figured up their notes." J. S. Franks further testified in the deposition that the deed of trust was executed "without any understanding with" the beneficiaries. "Q. Well, now, why didn't you include the Farmers & Merchants notes in that (deed of trust) too? A. It would have been in there just the same, we tried to settle with him. Q. Yes, but you made up the other notes for the full amount, why didn't you put the Farmers & Merchants note in? A. Well, we didn't do it, that was all. . . . We asked them to discount the notes. Q. And when they wouldn't do it that is why you undertook to prefer these gentlemen, is that it? A. That is it."

In the opening statement counsel for defendants, concerning J. S. Franks' allege indebtedness to his son, Ezra, said: "They allege that J. S. Franks and his wife did not owe Ezra Franks the amount mentioned in this deed of trust. . . . Now, some years ago, Mr. J. S. Franks was attacked with kidney trouble and he hasn't been able physically to properly handle and manage his farm like he did in his younger days. He always did have a good head on him, a good business manager, and this young son of his, in the 40's now, worked on that farm with an understanding and agreement with his father that he was to pay him for the services that he rendered on

that farm, he was offered, we will show you, $75.00 a month by other farmers in that vicinity while he was working for his father. It will be in evidence here that in 1925 or 1926, I don't remember the years, that Ezra Franks went to work on the railroad, I think the Santa Fe, . . . and he saved up something like $700.00 from his labor on the railroad. He had been working on this farm for his father and he came back and he put this $700.00 into this farm. He will tell the court what he used it for, different things, and it was considered as a loan, and he was to get for his services on this farm the measly sum of $1.00 a day and he has worked there for something like 15 or 16 years. We will show you by men who live around there and seen him working at four and five o'clock in the morning, get up and work all day on that farm and never had enough money to buy chewing tobacco, and he did that for 15 or 16 years. We will show that by his brothers and by his sisters and his father and his mother and by himself and by the neighbors around there.

"Now, he did business, I think, in the bank at Ethel, did it in the name, probably of J. S. Franks and Ezra Franks, he would deposit money from the proceeds realized from the sale of the products of that farm, deposited it in the bank and checked on it, probably, J. S. Franks, by Ezra Franks; and everything that was raised on that farm and hauled away from there and sold went to J. S. Franks and Ezra Franks, I suppose, all he got out of it was his board and a few pairs of overalls and this is an honest bona fide debt."

J. S. and Ezra Franks were present at the trial, but did not go upon the witness stand, and plaintiff invokes this fact as a circumstance in his favor. Plaintiff's evidence tended to show that the market value of the land was $20 to $25 per acre.

As a witness for defendants, Clay Surbeck, president of the Elmer Exchange Bank, testified as to the amount owing his bank by J. S. Franks, and when the debt was contracted; that he, shortly before the deed of trust was executed, talked with J. S. Franks, and that Franks said he could not pay the bank; that he told Franks that if he would secure the note he would give him more time, and that when Franks agreed to secure the note, he agreed to "continue carrying the note;" that if the deed of trust had also secured plaintiff and other creditors, he (Surbeck) "was still under obligations to accept this security." Witness said that all he agreed "to throw off" was the interest; that he appreciated the situation of J. S. and Ezra Franks.

Defendant, George A. Franks, testified that J. S. Franks owed him the amount secured by the deed of trust; that it was for money borrowed March 4, 1930; that J. S. Franks on February 14, 1933, paid him on the note $770.17; that on April 10, 1934, he figured up the amount due on his note, and that it amounted to $1094.22; that he

had no conversation with J. S. Franks "before they made the deed of trust to secure that note, only that he couldn't pay me and they wanted to secure me for it. They wanted to secure me. I did not have any conversation with him at all about it before he gave me that deed of trust. Only to secure me, that is my note, he couldn't raise the money, that is all. . . . I couldn't say how long it was after his deed of trust was recorded before I learned it had been executed and recorded. The papers was sent up there to the bank, I think was the first I knew of it. I had business at the La Plata Bank. I don't know the first time I knew it, I just accidentally happened to learn it when I went to the bank some time. I couldn't say how long afterwards it was exactly."

Plaintiff contends, especially as to Ezra's note for $5692, that the evidence raised a presumption of fraud, and that in such situation the duty rested on J. S. and Ezra Franks to come forward "and purge themselves," and that they failed to do so. "Recognized indicia or badges of fraud include fictitious consideration, false statements as to consideration, transactions different from the usual method of doing business, transfer of all of a debtor's property, insolvency, confidential relationship of the parties, and transfers in anticipation of suit or execution. None of these things alone prove fraud, but they do warrant an inference of fraud especially where there is a concurrence of so many of these badges." [Hendrix v. Goldman et al. (Mo.), 92 S. W. (2d) 733, 1. c. 736.]

In the present case, J. S. Franks, a short time before the execution of the deed of trust, talked with plaintiff and O. L. Polson, purporting to tell them what he (Franks) owed, and did not mention owing Ezra. He made two financial statements (1931 and 1932) to the Farmers & Merchants Bank, but did not mention any indebtedness to Ezra. The relationship of father and son existed between J. S. and Ezra Franks. Ezra testified in his deposition that he did not know where his father "got the figures in filling out that note for $5692;" that "he never figured it with him just that way." J. S. and Ezra Franks were in the courtroom during the trial, and presumably heard the statement of their attorney as to the consideration for Ezra's note, but they did not go upon the witness stand.

The burden of proof was on plaintiff, and no unfavorable presumption against defendants, J. S. and Ezra Franks, could have arisen, because of their failure to testify, until plaintiff made a prima facie case as to Ezra's note. [Shidloski v. New York, C. & St. L. Railroad Co., 333 Mo. 1134, 64 S. W. (2d) 259, 1. c. 264, and authorities there cited.]

"The fact that there is a family relationship between the debtor and the preferred creditor does not of itself affect the validity of the preference and is not a badge of fraud. If the debt is valid and no fraud attends the transaction a preference given to a relative

or a member of the debtor's family is as valid as if made to any other creditor. . . . A debtor may give a valid preference to his father, his mother, his child, his brother, or his sister. Nevertheless the relationship of the parties to the transfer is a circumstance to be considered in connection with other circumstances and given due weight in determining the good faith of the transaction.'' [Farmers & Merchants Bank v. Funk et al., 338 Mo. 508, 92 S. W. (2d) 587, l. c. 592, and cases there cited.]

We think that the facts as to the statements of J. S. and Ezra Franks respecting the indebtedness of J. S. and the evidence of Ezra from his deposition, coupled with the fact that J. S. and Ezra are father and son, and the failure of J. S. and Ezra Franks to testify constitute badges of fraud respecting the $5692 note. It is well settled that ''the failure of a party having knowledge of facts and circumstances vitally affecting the issues on trial to testify in his own behalf, or to call other witnesses within his power who have knowledge of such facts and circumstances, raises a strong presumption and inference that the testimony of such persons would have been unfavorable and damaging to the party who fails to proffer the same.'' [Baker v. Chicago, B. & Q. Railroad Co. et al., 327 Mo. 986, 39 S. W. (2d) 535, l. c. 543, and cases there cited. See also Baldwin v. Whitcomb, 71 Mo. 651, and Goldsby v. Johnson et al., 82 Mo. 602, l. c. 605.]

▇ Ezra Franks' note, of course, imported a consideration, and we are not unmindful of the rule that in an equity case we should give due deference to the finding of the trial court. However, under the facts here, we do not think that the trial court's finding can be sustained, except as to the 20 acres owned by Laura Franks and the homestead, if any, so far as concerns the Ezra Franks note, unless it be on the theory that the deed of trust did not render J. S. Franks insolvent within the meaning of insolvency when dealing with cases like the present one.

There was no evidence that J. S. Franks had any property, except 359 acres of land, and all this was included in the deed of trust, and in addition to the 359 acres, 20 acres belonging to defendant, Laura Franks, was included. Plaintiff testified that the market value of the land, at the time of the execution of the deed of trust, was $20 or $25 per acre. Plaintiff's witness, O. L. Polson, placed the value at $25 per acre. Defendants' witness R. B. Williams, sheriff, and John Schille, respectively, placed the value at $50, and $35 or $40 per acre. The average, according to plaintiff's evidence, was $22.50 per acre, and according to defendants the average was $41.33⅓ per acre. Eliminating the 20 acres owned by defendant, Laura Franks, there remains 359 acres, and at $22.50 per acre, the value was $8077.50. If the value is placed at $41.33⅓ per acre, the value was $14,838.64. J. S. Franks, at the time of the execution of the

deed of trust, if Ezra's note be included, and excluding the Patton $600, was obligated in the sum of $12,180.62.

There was no direct evidence on the subject of homestead, but the record shows that J. S. Franks lived on what is called the south farm, consisting of about 156 acres, and had lived there 40 years. Both sides seem to concede that a homestead did exist. Defendants say in their brief that "there was no showing in this case of how much of this land J. S. Franks occupied as a homestead, and, as a homestead is exempt, there could be no fraud in its conveyance." Plaintiff in his brief says that "the total indebtedness described in the deed of trust, if valid, equaled or exceeded the value of all the lands owned by defendant, J. S. Franks (even if his homestead of $1500 was not considered), and rendered him insolvent and with no property subject to execution." If J. S. Franks had a homestead, he and his wife had the right to place a mortgage upon it, and regardless of the purpose, creditors cannot complain. [Sec. 608, R. S. 1929, Mo. Stat. Ann., sec. 608, p. 4221.]

Under the situation we think the subject of homestead should be considered in connection with the question of solvency of J. S. Franks after the execution of the deed of trust. Deducting the value ($1500) of the homestead (Sec. 608, R. S. 1929) from the value of assets, $14,838.64, as given by defendants, there remains $13,338.64, an excess of $1158.02 over liabilities, if the Ezra Franks note is included in liabilities, and this we do, of course, in considering the subject of solvency. If the Patton $600 be included as a liability, the margin would only be $558.02.

In view of the wide margin as to value in plaintiff's and defendants' evidence, and because of the uncertainty as to the extent in acres of the homestead, we would not, under the facts here, be justified in ruling that the trial court could have sustained the deed of trust as to the $5692 note on the theory that the deed of trust did not render J. S. Franks insolvent.

We think that as to the $5692 note the deed of trust is void in part as hereinafter appears. Since we have found that as to the Ezra Franks note the deed of trust is tainted with fraud, does it necessarily follow, as plaintiff contends, that the whole deed of trust is tainted and void? It is stated in Munford v. Sheldon et al., 320 Mo. 1077, 9 S. W. (2d) 907, l. c. 910, that "where a part of the indebtedness or a part of the consideration for the execution of a deed is fraudulent the whole transaction is tainted with fraud." [Boland v. Ross et al., 120 Mo. 208, 25 S. W. 524; National Tube Works Co. v. Ring Refrigerating & Ice Machine Co., 118 Mo. 365, 22 S. W. 947; Barton et al. v. Sitlington, 128 Mo. 164, 30 S. W. 514, are cited in support of the statement quoted.] These cases deal with a single consideration. In the present case the deed of trust secured three separate notes whose holders had no common interest. So far

170

as concerns the question now in hand the situation is the same as if three separate deeds of.trust had been made.

The record clearly shows that defendants, George A. Franks, and Elmer Exchange Bank did not participate in any attempt or plan of J. S. Franks to defraud his creditors. Their obligations were bona fide. We rule this contention against plaintiff.

Plaintiff contends that defendants, Elmer Exchange Bank and George A. Franks agreed with J. S. Franks that if their notes were secured they would be discounted, and that, since these notes were secured for the full amount due, the deed of trust is void as to them. There is no merit in this contention. The rule claimed by plaintiff applies only when the mortgage or deed of trust secures a sum substantially in excess of the amount due. As appears, supra, the deed of trust secured the notes held by defendants, Elmer Exchange Bank and George A. Franks in the exact amount due.

It is our duty to do that which is just when such can be ascertained. The judgment should be reversed and the cause remanded with directions to the trial court to have the homestead, if any, of J. S. Franks ascertained and determined, and then enter a decree sustaining the deed of trust as to the notes held by the Elmer Exchange Bank and George A. Franks, and sustaining the deed of trust as to the note held by Ezra P. Franks only as to the homestead, if any, and the 20 acres of land owned by the defendant, Laura Franks, and to set aside the deed of trust as to the note held by Ezra P. Franks as to the remainder of the land. It is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The following opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur, except *Lucas, J.,* not sitting.